702 So.2d 202 (1997)
Johnny HOSKINS, n/k/a Jamil Alle, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 84737.
Supreme Court of Florida.
October 16, 1997.
Rehearing Denied December 9, 1997.
*203 James B. Gibson, Public Defender and James R. Wulchak, Chief, Appellate Division, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, for Appellant/Cross-Appellee.
Robert A. Butterworth, Attorney General and Kenneth S. Nunnelley, Assistant Attorney General, Daytona Beach, for Appellee/Cross-Appellant.
PER CURIAM.
This is an appeal of Johnny Hoskins' convictions of first-degree murder, burglary of a dwelling, sexual battery with physical force, kidnapping, and robbery and respective sentences, including a sentence of death imposed for the first-degree murder conviction. We also have for review the State's cross-appeal of the trial judge's refusal to find that the murder was committed in a cold, calculated, and premeditated manner. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm Hoskins' convictions and the sentences imposed except the sentence of death. For the reasons expressed, we find that we must remand this cause for the limited purpose of conducting a neurological test in accordance with the request of Hoskins' mental health expert before making a determination of whether a new penalty phase proceeding is required. We further conclude that the remaining issues raised by Hoskins and the State's cross-appeal are without merit.
Hoskins was convicted of the offenses set forth above based on the following facts. Police went to eighty-year-old Dorothy Berger's home on Sunday, October 18, 1992, after neighbors discovered that her door was *204 open but no one was home. The television and air-conditioning were on; a small amount of blood, a bent pair of eyeglasses, and a green hand towel were on the bed; several items in the room appeared to be out of place; a shoe impression was visible in the dust on the floor; and Berger's car was gone. There was no sign of forced entry. The victim had last been heard from around 6:30 p.m. on Saturday, October 17.
Hoskins lived with his girlfriend in the house next door to the victim's house. On the evening of October 17, a witness saw him driving a car similar to the victim's. At about 5 a.m. on October 18, Hoskins arrived at his parents' house in Georgia driving that same car. After he got to his parents' house, he borrowed a shovel and left. He returned about twenty minutes later. On Monday, October 19, he was stopped in Georgia for a traffic violation. Police subsequently determined that the car Hoskins was driving belonged to the victim. Police found vegetation and blood in the trunk of the car. Thereafter, Hoskins' father led police to an area near his home where the type of vegetation found in the trunk grew. The victim was discovered there in a grave with her hands tied behind her back and a gag in her mouth.
Further examination revealed that the victim had been raped; had numerous injuries to her body; had several blows to her head, one of which likely caused her to become unconscious; and had died of strangulation, which occurred after the sexual battery and beating. DNA analysis revealed that the semen found on the victim and on the victim's bed sheet could have come from Hoskins. Hoskins was found guilty by the jury of all charges.
The penalty phase proceeding before the original jury was subsequently set aside by the trial judge. Prior to the second penalty phase proceeding, defense counsel asked that Hoskins be transported to Duval County for neurological testing for the purpose of developing mitigating mental health evidence at the suggestion of the defendant's mental health expert. The trial judge denied the request. At the second penalty phase proceeding, the State again presented evidence regarding the facts of this case. Hoskins presented testimony from family members regarding his family life and presented evidence regarding his low I.Q., which was estimated to be about 71. He also presented the testimony of Dr. Krop, a neuropsychologist, regarding his mental condition. In rebuttal, the State presented the testimony of one of the jail nurses, who testified that Hoskins was able to express himself orally and in writing. The State also presented the testimony of a Brevard County School Board employee, who testified that Hoskins was learning disabled but not mentally retarded.
The jury in the second penalty phase proceeding unanimously recommended death, which the trial judge imposed, finding two aggravating circumstances: (1) the murder was committed during the course of a sexual battery or a kidnapping; and (2) the murder was especially heinous, atrocious, or cruel (HAC). The trial judge found that the evidence did not support the aggravating circumstance that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). Additionally, the trial judge found no statutory mitigators but did find the following nonstatutory mitigating circumstances to each of which he gave little weight: (1) Hoskins had a loving relationship with his family; (2) he was a father figure to his siblings; (3) he had protected his siblings from his father's violence and received beatings therefor; (4) he has low mental abilities; (5) he has a mild brain abnormality; (6) he came from an impoverished and abusive background; (7) he was influenced by racial problems during his school years; (8) he helped support his family; and (9) other miscellaneous aspects of Hoskins' life (tended to his pets, adept at woodworking and making clocks, and not a behavioral problem at school). The judge also sentenced Hoskins to life imprisonment on the burglary, sexual battery, and kidnapping counts, and fifteen years on the robbery count, with all of these sentences to run consecutive to the death sentence but concurrent to each other.
Hoskins raises four issues in this appeal, contending that (1) excusals from jury service were improperly granted; (2) the trial judge improperly denied Hoskins' motion for *205 neurological testing; (3) the trial judge improperly imposed the death penalty; and (4) Florida's death penalty statute is unconstitutional. In its cross-appeal, the State argues that the trial judge erred in rejecting CCP as an aggravating circumstance.

PART IGUILT PHASE

Improper Excusal of Prospective Jurors
In Hoskins' first and only convictionphase issue, he argues that he was deprived of his right to be tried by a fair and impartial jury drawn from a representative cross section of the community. He argues that his jury was unfairly selected because excusals from jury service must be granted by a trial court judge rather than the clerk of court and because in this case the court clerk rather than the trial judge was permitted to excuse certain jurors. Consequently, he contends that he is entitled to a new trial. We conclude that this issue has not been properly preserved for review.
At the time the prospective jurors were summoned for the trial in this case, the Eighteenth Judicial Circuit's chief judge had issued an administrative order, which provided in pertinent part: "The jury clerk may excuse members of a jury venire prior to reporting on the initial day of service for reasons set forth in Florida Statutes 40.013(1)-(5) and Florida Statutes 40.013(7)(9). All other bases for disqualification or excusal are to be directed to a judge." Section 40.013, Florida Statutes (1995), contains nine categories of reasons why prospective jurors may or must be excused from jury service, only two of which, subsections (5) and (6), implicate the court's discretion; the remaining categories require excusal and no discretion is involved. Subsection (6), however, is specifically excluded from the administrative order. Thus, only subsection (5) is at issue. That subsection provides as follows:
(5) A presiding judge may, in his or her discretion, excuse a practicing attorney, a practicing physician, or a person who is physically infirm from jury service, except that no person shall be excused from service on a civil trial jury solely on the basis that the person is deaf or hearing impaired, if that person wishes to serve, unless the presiding judge makes a finding that consideration of the evidence to be presented requires auditory discrimination or that the timely progression of the trial will be considerably affected thereby. However, nothing in this subsection shall affect a litigant's right to exercise a peremptory challenge.
(Emphasis added.) Because the statute specifically provides that the presiding judge may exercise the excusal options set forth in that provision based on "his or her discretion," Hoskins argues that the administrative order issued by the chief judge of the circuit inappropriately removed this discretionary duty from the judge who conducted the trial. Hoskins filed a "motion with reference to jury procedure." In the motion, he asked the court "to enter an order preventing the jury clerk from excusing members of a jury venire prior to examination by the Court." This motion was filed in open court, at which time any potential jurors whose excusal might have been at issue would have already been excused. While Florida Rule of Criminal Procedure 3.290[1] does provide that a jury panel may be challenged on the ground that the prospective jurors were not selected or drawn according to law, the motion at issue merely requests the judge to issue an order preventing the clerk from excusing members of the jury venire; it did not challenge the panel. Consequently, the requested relief was not available at the time the *206 motion was filed because the excusals had already occurred. Because the requested relief was not timely filed, we must find that this issue is procedurally barred.
In reaching this decision, however, we emphasize that we are in no way sanctioning any process whereby a clerk of court is to carry out statutory mandated judicial responsibilities. We conclude that trial judges may not delegate their discretionary authority under section 40.013(5) to clerks of court or any other official.

PART II-PENALTY PHASE ISSUES
Hoskins' remaining four issues involve the penalty phase portion of his trial.

HAC
We first address Hoskins' contention that the trial judge improperly found that the murder was heinous, atrocious, or cruel (HAC). In his sentencing order, the trial judge carefully reviewed four aggravating circumstances, finding that the evidence supported only two: committed during the course of a sexual battery and kidnapping, and HAC. In finding the murder to be HAC, he stated:
The murder of Dorothy Berger was accompanied by such additional acts of the defendant that set this crime apart from the norm of capital felonies, so that it can be said that this was a conscienceless and pitiless crime which was unnecessarily torturous to the victim. State v. Dixon, 283 So.2d 1 (Fla.1983[1973]).
The defendant entered the home of Dorothy Berger, an 81-year-old woman, and attacked and raped her in her home with sufficient force to tear her perineum. The medical examiner testified the rape would have caused pain to the victim, and that the rape occurred before her death. A small blood stain was found on Dorothy Berger's bed along with semen from the defendant. A locked box in the home had a small amount of blood on it. No other blood was found in the victim's home. Dorothy Berger was severely beaten and bruised and battered from the top of her head to her feet. Her cheekbone was broken. She suffered two massive blows to her head from a blunt instrument. The medical examiner testified these blows would have caused profuse bleeding, yet very little blood was found in the home. He also testified one blow could have caused the victim to lapse into unconsciousness, but it would be rare for such period of unconsciousness to have lasted more than a half an hour to an hour. He could not definitely state whether she was unconscious or how long any period of unconsciousness would have lasted.
As there was no significant blood found in the home, the only reasonable inference is that the victim was hit on the head after the rape and struggle in her home. Therefore, she must have been conscious during the rape in her home. Her face, neck and wrists suffered injuries from tight binding and gagging. Dorothy Berger had numerous defensive wounds about her hands, arms, and legs, showing she was conscious and vainly attempting to fend off her attacker. The medical examiner testified she was alive when she was bound and gagged, because such bruising does not occur after death. Her body was virtually bruised and lacerated from head to toe. The medical examiner testified that none of these wounds would have been fatal, and that the wounds were sustained prior to her death by manual strangulation. According to the medical examiner, death by manual strangulation requires a constant pressure for three to four minutes.
The defendant bound and gagged Dorothy Berger and placed her in the trunk of her car, as evidenced by the blood stains in the trunk. The only reasonable inference is that Dorothy Berger was alive at the time she was placed in the car, else there would have been no need to bind and gag her. Clearly, she was alive when gagged, as evidenced by the medical examiner's testimony. The defendant then used Dorothy Berger's car to transport her to Georgia, where he buried her in a field a few miles from his parents' home. Defendant kept Dorothy Berger's car, and was apprehended in Georgia driving the car. Her *207 body was discovered buried in the field, bound, gagged and severely beaten.
The brutal rape of the victim sets this murder apart from the norm of capital felonies. According to the testimony of the medical examiner, the rape was painful because of the associated vaginal tearing. A violent sexual assault and resulting trauma can be a factor to support a finding of heinous, atrocious and cruel. Capehart v. State, 583 So.2d 1009 (Fla. 1991).
This Court has accepted the expert opinion of the medical examiner that the homicide of Dorothy Berger was the result of strangulation or suffocation with such force her thyroid cartilage was fractured. The medical examiner was unable to state whether Dorothy Berger was conscious during the strangulation.
However, she clearly was conscious during the savage beating, as evidenced by the defensive wounds. This savage beating shows the defendant's desire to inflict a high degree of pain. The brutal senseless beating inflicted on Dorothy Berger sets this crime apart from the norm of capital felonies and clearly reflects the conscienceless, pitiless and unnecessarily torturous nature of this crime. Scott v. State, 494 So.2d 1134 (Fla.1986). Evidence that a victim was severely beaten while warding off blows before being killed has been held sufficient to support a finding that the murder was especially heinous, atrocious and cruel. Wilson v. State, 493 So.2d 1019 (Fla.1986). The Court finds that the State has proven the murder was especially heinous, atrocious and cruel because of severe beating and violent rape of Dorothy Berger. Taylor v. State, 630 So.2d 1038 (Fla. 1993).
Hoskins argues that the judge erroneously concluded that the murder was HAC because the crime was the result of an unintentional, angry reaction and because there was no showing that the victim was conscious during the attack. We find that the facts set forth by the trial judge are supported by the record and fully establish beyond a reasonable doubt that this murder was HAC. Consequently, we reject Hoskins' claims to the contrary.

Evaluation of Mitigating Circumstances
Next, we evaluate Hoskins' argument that the trial judge used the wrong standard in reviewing the mitigating circumstances and improperly rejected or gave little weight to factors in mitigation. In stating that the trial judge used the wrong standard, Hoskins quotes the trial judge's statement that "no excuse or justification has been shown." We find this argument to be without merit. When that comment is placed in context with the remainder of the sentencing order, it is clear that the trial judge applied the appropriate standard in finding that death was the appropriate penalty. In fact, the trial judge recognized that the imposition of death is to be reserved for the most aggravated and unmitigated of crimes. Additionally, he stated that he considered all of the mitigating circumstances claimed by Hoskins, that the mitigating circumstances may be considered as extenuating or reducing the degree of moral culpability for the crime if those factors are of sufficient weight to counterbalance the aggravating factors, and that the trial court must expressly evaluate in its order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether it is truly of a mitigating nature. The trial judge meticulously listed the nine asserted factors in mitigation,[2] finding that each was established by the evidence but that each should be accorded little weight. Subsequently, he concluded that the mitigating circumstances were insufficient to outweigh the factors in aggravation. We find that the trial judge properly followed the requirements set forth by this court in Campbell v. State, 571 So.2d *208 415 (Fla.1990),[3] for evaluating evidence in mitigation. Moreover, in that case, we specifically stated that the relative weight to be given each mitigating factor is within the province of the sentencing judge. Contrary to Hoskins' contentions, we do not find the trial judge to have issued a "bare bones" order; rather the order precisely sets forth each aggravating and mitigating circumstance and sets forth the weight the trial judge attributed to these circumstances in determining whether to impose a death sentence.

Constitutionality of the Death Penalty
Next, Hoskins argues that, for a number of reasons,[4] the death penalty statute is unconstitutional. We find this claim to be without merit; the reasons given in support of this claim have been repeatedly rejected by this Court. Hunter v. State, 660 So.2d 244 (Fla.1995); Preston v. State, 607 So.2d 404 (Fla.1992); Patten v. State, 598 So.2d 60 (Fla.1992); Jones v. State, 569 So.2d 1234 (Fla.1990).

Neurological Testing and Transport
Finally, Hoskins claims that the trial judge committed prejudicial error in denying his motion for neurological testing and motion to transport. In his motion, Hoskins asked that the court allow him to be transported from Brevard to Duval County for the purpose of having a Positron Emission Tomography Scan (PET-Scan) performed to enable his neuropsychologist to more accurately determine the extent of Hoskins' purported brain damage. At the hearing on this issue, it was shown that funds were available from the office of the public defender to pay for the test. Further, Dr. Krop proffered that the test was necessary for him to render a more precise opinion regarding Hoskins' mental condition. Specifically, Dr. Krop stated:
DEFENSE COUNSEL: How critical would the penalty input and the PET Scan inin this case in the organisity in Mr. Hoskins?
KROP: Whatone of the issues based on my findings is the possibility that there is a neurological problem whichparticularly with my findings which showed impairment in the frontal lobe, which is the area which is responsible for inhibition, impulse control and so forth. When there is a violent crime such as in this particular situation, one of the things we would want to know is there a neurological basis for causing a person's poor impulse control.
....
DEFENSE COUNSEL: What would be the significance of the information or data you would gather from [the PET Scan] as it relates to a penalty phase proceeding?
KROP: Well, it would certainly in my opinion give me an opportunity to render an opinion with regard to the neurological status of thisof Mr. Hoskins to a more definitive level than I was able to previously or that I can with the current data that I have available.
DEFENSE COUNSEL: So you believe that you could make a more definitive and more preciseprecise determination and an opinion with respect to Mr. Hoskins if you had the data from this test?
KROP: Yes, sir, I could.

*209 DEFENSE COUNSEL: Do you recommend that test be performed upon Mr. Hoskins based upon your evaluation of him and the materials that you have outlined?
KROP: Yes, I do.
During the hearing, the trial judge noted that the State had not made Hoskins'"mental condition relevant." Subsequently, the trial judge denied Hoskins' request for the PET-Scan, finding that it would be "highly suggestive at best."
The State, which put on no expert testimony, argues that the trial judge correctly denied Hoskins' request because the PET-Scan would have added nothing to Dr. Krop's testimony, especially since Dr. Krop is a neuropsychologist rather than a physician.
Notably, Dr. Krop was appointed by the trial court as an expert to assist in the preparation of Hoskins' defense. As indicated above, at the hearing on this issue Dr. Krop proffered that the PET-Scan was necessary for him to render a more definitive opinion regarding Hoskins' mental condition, and he recommended that the test be performed. Additionally, as noted above, funds were available for the test. Under these circumstances, we conclude that the trial judge abused his discretion in refusing to grant the test in light of the court-appointed expert's unrefuted statement that this particular test was necessary to the expert's proper evaluation of Hoskins. The fact that Dr. Krop is a neuropsychologist rather than a physician is irrelevant.[5]
As noted by the United States Supreme Court in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), when a defendant demonstrates to the trial judge that his mental condition is at issue, the defendant must have access to a mental health expert who will conduct an appropriate examination and assist in evaluating, preparing, and presenting the defendant's defense. This is especially true in death cases, where "the consequence of error is so great." Id. at 84, 105 S.Ct. at 1097. We have previously found that the failure of a mental health expert to adequately investigate a defendant's mental history and to order, if warranted, additional testing regarding the defendant's condition deprives the defendant of due process. State v. Sireci, 536 So.2d 231 (Fla.1988). This is because such failure may deny a defendant the opportunity through an appropriate psychiatric examination to rebut factors in aggravation and to develop factors in mitigation of the death penalty. Ake; Sireci.
Under section 921.141, Florida Statutes (1995), there are at least three statutory mitigating circumstances that may involve a defendant's mental condition:
(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.
....
(e) The defendant acted under extreme duress....
(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
In this case, the trial judge found no statutory mitigating circumstances and found as a nonstatutory mitigating circumstance that Hoskins' has a "mild brain abnormality." Without knowledge of the requested testing results, which could have provided additional information regarding the extent of Hoskins' mental condition, the trial judge determined that the test would not aid this neuropsychologist in rendering an opinion in this case. We find the denial of the motions that would have allowed this testing to be error. The error was compounded by the judge's conclusion that Hoskins' mental condition was not at issue. As indicated above by the mitigating *210 circumstances set forth in the statute, a defendant's mental condition is a major element to be considered in a penalty phase proceeding regardless of whether the State places that condition "at issue."
We cannot say, without benefit of the requested testing, that this error had no effect on the outcome of this proceeding. Consequently, we conclude that we must remand this case for the limited purpose of having the trial judge order that a PET-scan be conducted on Hoskins' as requested by Dr. Krop. After the PET-scan is conducted, the trial judge shall hold a limited evidentiary hearing for the purpose of determining whether the PET-scan shows an abnormality and, if so, whether the results of the PETscan cause Dr. Krop to change his trial testimony. The trial judge's review must be limited to a determination of whether Dr. Krop's testimony would change; the judge will not have the discretion to evaluate the effect of that change in testimony on the jury's recommendation. If the trial judge finds that Dr. Krop's testimony would change solely because of the PET-scan results, then we have determined that a new penalty phase proceeding is required.

PART IIISTATE'S CROSS-APPEAL
We now turn to the State's crossappeal, in which it argues that the trial judge improperly concluded that the aggravating circumstance of cold, calculated, and premeditated (CCP) was not supported by the facts of this case. According to the State, this case supports a finding of CCP because the victim could identify the defendant, the victim was apparently alive when taken from her home, she was tied up and gagged and placed in the trunk of her own car, and she was driven to a remote location and buried.
To support a finding of the CCP aggravator, the evidence must establish beyond a reasonable doubt that: (1) the murder was the product of cool and calm reflection; (2) there was a careful plan or prearranged design to commit murder before the fatal incident; (3) there was heightened premeditation; that is, premeditation over and above what is required for unaggravated first-degree murder; and (4) there was no pretense of moral or legal justification for the murder. Walls v. State, 641 So.2d 381 (Fla.1994). Generally, this aggravating circumstance is reserved for execution or contract murders or witness elimination type murders. See, e.g., Maharaj v. State, 597 So.2d 786 (Fla. 1992); Pardo v. State, 563 So.2d 77 (Fla. 1990). Simply proving a premeditated murder for purposes of guilt is not enough to support CCP; greater deliberation and reflection is required. Walls.
In his sentencing order, the trial judge stated:
[CCP] has not been proven beyond a reasonable doubt. A heightened form of premeditation is required to prove this aggravating circumstances. As interpreted by the Florida Supreme Court, this means "a degree of premeditation exceeding that necessary to support a finding of premeditated first-degree murder." Capitant[Capehart] v. State, 583 So.2d 1009 (Fla.1991); Geralds v. State, 601 So.2d 1157 (Fla.1992). In the instant case, the circumstantial evidence presented on this issue was legally insufficient to negate other reasonable hypotheses of the degree of premeditation to murder.
We agree. Many of the facts used by the State to support a finding of CCP are based on speculation. As admitted by the State in closing arguments, it is unclear when or where the victim was actually killed and there is no proof that the murder was planned ahead of time. Under the circumstances of this case, we find that the trial judge clearly did not abuse his discretion in finding that the murder was not CCP.

CONCLUSION
Accordingly, we affirm Hoskins' convictions of first-degree murder, burglary of a dwelling, sexual battery with physical force, kidnapping, and robbery and respective sentences for all but the first-degree murder conviction. Further, we remand this cause for the limited purpose of having the trial judge order that a PET-scan be conducted on Hoskins as requested by Dr. Krop. After the PET-scan is conducted, the trial judge shall conduct an evidentiary hearing for the purpose of determining whether the PET-scan *211 shows an abnormality and, if so, whether the results of the PET-scan cause Dr. Krop to change his trial testimony. If the trial judge finds in the affirmative, then a new penalty phase proceeding shall be conducted. Our remand is limited solely to this issue, and we direct that the PET-scan and hearing be conducted within sixty days from the date this opinion becomes final. During the pendency of this remand, the sentence of death in this cause shall be held in abeyance. After the trial judge makes a determination on this issue, this case shall be returned to this Court.
It is so ordered.
OVERTON, GRIMES, HARDING and WELLS, JJ., concur as to part I.
KOGAN, C.J., and OVERTON, SHAW and ANSTEAD, JJ., concur as to part II.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING, WELLS and ANSTEAD, JJ., concur as to part III.
ANSTEAD, J., dissents with an opinion as to part I, in which KOGAN, C.J., and SHAW, J., concur.
GRIMES, J., dissents with an opinion as to part II, in which HARDING and WELLS, JJ., concur.
ANSTEAD, Justice, dissenting as to part I.
I cannot agree with the majority's conclusion that the death-sentenced appellant did not properly preserve the juror qualification issue.[6]
Rule 3.290 of the Rules of Criminal Procedure explicitly provides:
The state or defendant may challenge the panel. A challenge to the panel may be made only on the ground that the prospective jurors were not selected or drawn according to law. Challenges to the panel shall be made and decided before any individual juror is examined, unless otherwise ordered by the court. A challenge to the panel shall be in writing and shall specify the facts constituting the ground of the challenge. Challenges to the panel shall be tried by the court. Upon the trial of a challenge to the panel the witnesses may be examined on oath by the court and may be so examined by either party. If the challenge to the panel is sustained, the court shall discharge the panel. If the challenge is not sustained, the individual jurors shall be called.
(Emphasis supplied). As noted by the majority, the defendant here made it clear to the trial court that he wished a venire untainted by the unlawful disqualifications at issue. What more would the majority have the defendant do after he discovers that the jury venire has been improperly drawn? In this regard I agree with the argument contained in appellant's reply brief:
The state contends, without citing any authority, that it is somehow too late to contest the representation of the jury venire prior to individual jury selection in his case. Is counsel for the state contending that trial counsel must be psychic, to know ahead of time if the court clerk is going to excuse potential jurors from the jury panel? At any rate, Florida law provides that the challenge here was indeed timely. Rule 3.290, Florida Rules of Criminal Procedure, provides that a challenge to the entire jury panel is timely if made in writing prior to individual examination of the jury venire in the particular case. See also State v. Bethel, 268 So.2d 557 (Fla. 3d DCA 1972); State v. Silva, 259 So.2d 153 (Fla. 1972); Green v. State, 60 Fla. 22, 53 So. 610 (1910). The motion was filed and heard prior to individual examination of any jurors in this case.
Rule 3.290 explicitly provides that before any individual jurors are examined, the State or defendant may challenge a jury panel that was not "selected or drawn according to law." That is precisely what defendant did here.

RIGHT TO REPRESENTATIVE JURY
It is an established tradition in this country that a jury be representative of the community. Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940); amends. VI, XIV, U.S. Const; art. I, § 16, *212 Fla. Const. In Bass v. State, 368 So.2d 447, 449 (Fla. 1st DCA 1979), the court reaffirmed that the constitutional guaranty of a jury trial includes assurance that the jury be drawn from a fairly representative crosssection of the community. Quoting from Taylor v. Louisiana, 419 U.S. 522, 530, 95 S.Ct. 692, 697-98, 42 L.Ed.2d 690 (1975), a case in which women had been systematically excluded from jury service, the court stated:
We accept the fair-cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment and are convinced that the requirement has solid foundation.... This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system.
By the court clerk's unlawful excusal of certain classes of people pursuant to a Chief Judge's administrative order, and without the presiding judge hearing the specific reasons for the excusal in each of the jurors' cases, the defendant has been denied a trial by a jury comprised of a fair cross-section of the community. By the clerk's action, and in direct violation of section 40.013, thousands of lawyers, doctors and others have been unlawfully excluded from jury service. Obviously, the constitution does not require perfect proportional representation of all societal groups across the board. However, doctors and attorneys are obviously "large, distinctive groups" whose summary exclusion from jury pools is fundamentally incompatible with the Supreme Court's decision in Taylor.
Beyond the constitutional issue, systematic excusal of attorneys, doctors, and other groups raises another troubling concern. Are certain groups exempt from performing this essential public service, the linchpin of our criminal and civil justice systems? Specifically, if attorneys and doctors are essentially given a "bye" when it comes to performing a basic civic responsibilityjury servicesociety will be discarding traditional notions of fairness and public duty. Thus, while the Supreme Court was concerned that the wholesale exclusion of certain groups from venires would prejudice criminal defendants and possibly erode "public confidence in the fairness of our criminal justice system," an equally worrisome trend could develop if a privileged few are permanently exempt from what some view, correctly or not, as an onerous task. Everyone has a civic duty to serve when called, just as everyone must shoulder any resulting personal burdens, while also reaping this intangible benefit of responsible and active citizenship. All of society has an equal stake in how justice is administered.
Perhaps as important, in this case by a blanket administrative order in violation of an explicit Florida statute, numerous citizens have been denied their right and duty to serve as jurors just because they are doctors, lawyers or members of other groups described in the statute. Clearly that was not the intent of the legislature. Common sense tells us otherwise. In fact, retired Justice Parker Lee McDonald has recently written an article in The Florida Bar News describing his jury service and urging lawyers to serve as jurors when they are called. See Retired Chief Justice Sees Jury Duty From the Other Side of the Bench, Fla. Bar News, April 1, 1997, at 2. This writer recently attended a conference on professionalism which featured a panel of former jurors, two of whom were attorneys. Jury service by lawyers and doctors should be encouraged, not arbitrarily prohibited.
The jury panel here was unlawfully drawn and was timely and properly challenged pursuant to rule 3.290 before any individual juror was examined. The panel should have been stricken and a new panel drawn in accordance with the law and without the wholesale exclusions unlawfully ordered here.
KOGAN, C.J., and SHAW, J., concur.
GRIMES, Justice, dissents with an opinion as to part II.
I cannot agree that this case should be remanded for Hoskins to undergo a PETscan. This is a far cry from Ake v. Oklahoma, *213 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), in which a defendant claiming an insanity defense was denied the right to a psychiatric examination. State v. Sireci, 536 So.2d 231 (Fla.1988), is not relevant because that case involved only the issue of whether there was sufficient evidence to support the trial judge's finding that the court-appointed psychiatrists had overlooked the possibility that the defendant suffered from brain damage. The issue in this case is whether Hoskins had a due process right to further medical testing when he had already been examined by a neurologist (who did not testify) and a neuro-psychologist who was able to say that Hoskins had brain damage without further testing.
The reason why Dr. Krop recommended a PET scan was to determine more definitively what was causing Hoskins' brain damage. He admitted that it would not help him in determining whether such brain damage would have a causal relationship to Hoskins' commission of the crime. This is reflected in the following portion of Dr. Krop's testimony that was read to the jurors at the trial:
Q. Doctor, you testified that people do exhibit the test results which Mr. Hoskins exhibited when he took your battery of tests often have impulse control problems, but you said you didn't have sufficient data. What type of data would help you to more testify with more certainty?
A. Well, I guess if I had more information about other episodes of impulse control and if I had more, I guess, samples of his behavior, which would reflect an individual who has difficulty controlling himself, that might add more weight or more support to my findings.
Q. Would the PET scan shed any light on that issue?
A. I think what the PET scan would do would be it would shed more light on probably more definitely the types of problems that may be causing the brain damage that may show up on my test. I don't know if that thenwe would need past history to support the impulse control situation.
At the hearing on the motion to authorize the PET-scan, Dr. Krop gave similar testimony.
Q. Well, Doctor, assuming that we won't dispute that he has brain damage, okay, the State never did dispute the existence of brain damage. My question is even assuming there is brain damage, is that going to change your answers with regard to the fact that you cannot say that there is a relationship between that brain damage and the specific behavior exhibited here?
A. That is probably true, unless I received additional information.
The clear import of Dr. Krop's testimony is that in order to relate Hoskins' brain damage to any purported lack of impulse control, he would have to have information (which was never forthcoming) concerning other instances in which Hoskins had demonstrated that he had difficulty in controlling himself. At most, Dr. Krop's interest in having a PET-scan was to confirm his opinion that brain damage existed. However, the State never contended that Hoskins did not have brain damage. The judge, himself, found that Hoskins did have brain damage. Under these circumstances, the trial judge did not abuse his discretion in denying the motion to transport Hoskins to Jacksonville for a PET-scan.
I would affirm the judgment of guilt and the sentence of death.
HARDING and WELLS, JJ., concur.
NOTES
[1] Florida Rule of Criminal Procedure 3.290 provides:

The state or defendant may challenge the panel. A challenge to the panel may be made only on the ground that the prospective jurors were not selected or drawn according to law. Challenges to the panel shall be made and decided before any individual juror is examined, unless otherwise ordered by the court. A challenge to the panel shall be in writing and shall specify the facts constituting the ground of the challenge. Challenges to the panel shall be tried by the court. Upon the trial of a challenge to the panel the witnesses may be examined on oath by the court and may be so examined by either party. If the challenge to the panel is sustained, the court shall discharge the panel. If the challenge is not sustained, the individual jurors shall be called.
[2] (1) Hoskins had a loving relationship with his family; (2) he was a father figure to his siblings; (3) he had protected his siblings from his father's violence and received beatings therefor; (4) he has low mental abilities; (5) he has a mild brain abnormality; (6) he came from an impoverished and abusive background; (7) he was influenced by racial problems during his school years; (8) he helped support his family; and (9) other miscellaneous aspects of Hoskins' life (tended to his pets, adept at woodworking and making clocks, and not a behavioral problem at school).
[3] In Campbell, we stated that the trial court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature. We also concluded that the court must weigh the aggravating circumstances against the mitigating and, to facilitate appellate review, must expressly consider in its written order each established mitigating circumstance.
[4] Hoskins contends that the statute is unconstitutional because heinous, atrocious, or cruel is improperly defined, death may be imposed by a mere majority verdict, the jury instructions do not properly inform the jury of the weight of its recommendation, a defendant has no say so in the selection of counsel, the trial judge's role is ambiguous, appellate review is arbitrary, the aggravating circumstances do not rationally narrow those who are to receive the death penalty, the use of the contemporaneous objection rule has led to disparate treatment, a special verdict form should be used, mitigation of a death sentence is prohibited, the statute creates a presumption of death, juries are erroneously told not to consider sympathy, and electrocution is cruel and unusual punishment.
[5] Neuropsychology is defined as "[a] specialty of psychology concerned with the study of the relationships between the brain and behavior, including the use of psychological tests and assessment techniques to diagnose specific cognitive and behavioral deficits and to prescribe rehabilitation strategies for their remediation." Stedman's Medical Dictionary 1049 (25th ed.1969). Neuropsychiatry is defined as "the specialty dealing with both organic and psychic disorders of the nervous system." Id. Both specialties deal with the relationships between the brain and behavior. Further, as Dr. Krop proffered at the hearing, the PET Scan is a relatively new examination that is now recognized in the field of neuropsychology as a valid diagnostic tool.
[6] I agree with the majority's resolution of the PET-scan issue.