761 So.2d 269 (1999)
Michael ROBINSON, Appellant,
v.
STATE of Florida, Appellee.
No. 91,317.
Supreme Court of Florida.
August 19, 1999.
Rehearing Denied October 25, 1999.
*270 James B. Gibson, Public Defender, and Christopher S. Quarles, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Judy Taylor Rush, Assistant Attorney General, Daytona Beach, Florida, for Appellee.
PER CURIAM.
We have on appeal the order of the trial court imposing the death penalty upon Michael Robinson. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. Based on reasons which follow, we affirm Robinson's sentence of death.

PROCEDURAL POSTURE
This is Robinson's second direct appeal from a sentence of death. In 1995, Robinson pled guilty to the first-degree murder of Jane Silvia. During the plea colloquy, Robinson specifically expressed his desire to "seek the death penalty in this case" and defense counsel explained to the court that Robinson did not want to present any mitigating evidence in his defense. Robinson waived his right to a jury and the cause proceeded to sentencing. The State presented Detective David Griffin who played an audio tape of Robinson's confession to the crime. The defense presented mitigating evidence it had received from a psychologist, Dr. Berland, and Robinson's mother, and a presentence report detailing the circumstances of the crime and Robinson's background was also submitted to the trial court.[1] On April 12, 1995, the trial court sentenced appellant to death. The court found three aggravating circumstances: (1) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest, see § 921.141(5)(e), Fla. Stat. (1995); (2) the capital felony was committed for pecuniary gain, see id. § 921.141(5)(f); and (3) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification, see id. § 921.141(5)(i). Although the court stated it did not consider any of the evidence presented in mitigation, the court also concluded that the aggravating circumstances could not be outweighed by any potential mitigating circumstances and sentenced appellant to death.
*271 On appeal, this Court reversed Robinson's sentence of death. See Robinson v. State, 684 So.2d 175 (Fla.1996). We held the trial court failed to consider the evidence proffered in mitigation in violation of Farr v. State, 621 So.2d 1368 (Fla.1993). See Robinson, 684 So.2d at 179. As noted in our opinion, Farr requires the trial court to consider mitigation in cases even where the defendant argues in favor of the death penalty, as well as where the defendant asks the court not to consider mitigating evidence. See id. (citing Farr, 621 So.2d at 1369). Accordingly, this case was remanded to the trial court for a new penalty phase hearing. Id.

NEW PENALTY PHASE
At the new penalty phase proceeding the State again presented Detective David Griffin as its sole witness and he again played the audio cassette tape of Robinson's confession. According to Robinson's confession, he and Silvia had been dating, and prior to the murder he had stolen Silvia's television and VCR to pawn for money with which to purchase drugs. Robinson's mother sent Silvia money to buy back her property and she kept this money in her shoes. After their unsuccessful attempts to get back Silvia's property, Robinson and Silvia returned home and Silvia fell asleep on the couch. Robinson then went to his truck to obtain a drywall hammer. He laid the hammer in the bedroom and waited until he was certain Silvia was asleep. He then hit her in the head with the hammer twice, each time piercing her skull. Robinson claimed that Silvia never regained consciousness, although she was still breathing and blood poured from her mouth. Robinson then stuck the claw part of the hammer into the victim's skull. Further, to stop Silvia's breathing and heart beat, Robinson stuck a serrated knife into the soft portion of her neck and down into her chest. After Silvia died, Robinson buried her and took the money that she had hidden in her shoes. During his confession, Robinson also admitted that he had initially lied to the police by telling them that drug dealers had killed Silvia. During a supplemental interview, Robinson stated that he killed Silvia "because he didn't want to battle her for the money" and because he did not want to return to prison.
The defense presented three witnesses: Dr. James Upson, a neuropsychologist; Dr. Jonathan Lipman, a neuropharmacologist; and Barbara Judy, Robinson's mother.[2] Dr. Upson conducted a battery of clinical tests on Robinson which he claims indicate that Robinson is of above-average intelligence but that he is impaired in the frontal and left temporal lobe of his brain. According to Dr. Upson, Robinson's brain impairment could be caused by a number of factors, including: recent drug use, the use of forceps during birth, and loss of consciousness during two episodes in his childhood, once when he was hospitalized for diverticulum and once when he was thrown in a pool while tied in an apparent Houdini imitation. Upson also testified that as a child, Robinson suffered from attention deficit disorder (ADD) and was prescribed Ritalin. Robinson is a chronic drug abuser who started consuming alcohol, marijuana and LSD in his teens, and eventually moved to methamphetamine and then cocaine, which he continued to use up until the murder. Dr. Upson also testified that Robinson was exposed to toxic poisoning in his early twenties and suffered a head injury when he was struck by an automobile while riding a bike. According to Dr. Upson, any of the above incidents could have caused Robinson's impairment. On cross-examination, Dr. Upson admitted that Robinson also exhibited *272 signs of antisocial personality disorder, such as unpredictability, impulsiveness, manipulativeness, anger, suspiciousness, and moodiness,
Dr. Lipman testified about the effect chronic drug use had on Robinson. He opined that Robinson suffered from conceptual aberrations caused by LSD and that the combination of drugs consumed by Robinson caused a psychotoxic effect which produced profound and long-lasting hallucinations and derangement of reality testing. When asked about symptoms one feels after the effects of cocaine wears off, Dr. Lipman explained: "With regard to cocaine and amphetamines, the withdrawal syndrome is characterized mostly by profound depression. However, if the user has experienced the drug chronically or at high doses to the point of frank psychosis, that psychosis does not immediately go away when the drug leaves the system. It persists for weeks and months. ... We think those people probably have preschizophrenic processes going on in their brain." Dr. Lipman added that the psychotic effect experienced by chronic users is often joined by severe depression. Finally, Dr. Lipman testified that when he interviewed Robinson, he was in a drug-free state yet still exhibited signs of brain abnormalities in the temporal lobe. According to Dr. Lipman, that condition was exacerbated by extensive cocaine use, and at the time of the offense Robinson suffered from "a state of unreality brought about by the chronic effect of cocaine."
Both doctors agreed that drugs controlled Robinson's life and that because of his chronic drug use, Robinson was under extreme emotional disturbance and unable to control his actions.[3] However, both doctors admitted that at the time of the offense, Robinson knew what he was doing and knew that his conduct was wrong. Finally, both doctors agreed that Robinson suffered from emotional duress because he believed he would be sent back to prison unless he killed the victim. According to Dr. Lipman, Robinson feared prison because he had been raped several times while incarcerated. Both doctors testified that a Single Photon Emission Computed Tomography (SPECT) scan would have been helpful in locating Robinson's brain damage.
Other facts presented by the defense included: Robinson's father was an alcoholic who verbally abused Robinson and who disowned Robinson when he was fourteen or fifteen years of age, causing him to become a ward of the state and to be placed in a juvenile detention facility; Robinson married at the age of seventeen to a woman who introduced him to speed ballinga form of intravenous drug use combining the drugs preludin and dilaudid; at the age of nineteen, Robinson used cocaine an entire month without sleep; and just prior to the murder, Robinson spent four weeks hinging on cocaine. Finally, Robinson's mother testified that she loved her son but knew that he abused drugs and that she had attempted to help him over the years by placing him in rehabilitation facilities. She also stated that Robinson's father was abusive and that Robinson's paternal grandfather had a mental disorder and died in a mental institution. Finally, John Thomas, the victim's brother, testified that Robinson destroyed his family.
The trial court considered the foregoing evidence as well as the mitigating and aggravating evidence introduced at the initial penalty phase proceeding and again sentenced Robinson to death. The court found the same three aggravating factors as before: (1) the murder was committed for pecuniary gain; (2) the murder was committed to avoid arrest; and (3) the *273 murder was cold, calculated and premeditated. The trial court also found two statutory mitigating factors: (1) Robinson suffered from extreme emotional distress (some weight) and (2) Robinson's ability to conform his conduct to the requirements of the law was substantially impaired due to history of excessive drug use (great weight).
Of the nonstatutory mitigation presented, the trial court found: (1) Robinson had suffered brain damage to his frontal lobe (given little weight because of insufficient evidence that brain damage caused Robinson's conduct); (2) Robinson was under the influence of cocaine at the time of murder (discounted as duplicative because cocaine abuse was considered in statutory mitigators); (3) Robinson felt remorse (little weight); (4) Robinson believed in God (given little weight); (5) Robinson's father was an alcoholic (given some weight); (6) Robinson's father verbally abused family members (given slight weight); (7) Robinson suffered from personality disorders (given between some and great weight); (8) Robinson was an emotionally disturbed child, who was diagnosed with ADD, placed on high doses of Ritalin, and placed in special education classes, changed schools five times in five years, and had difficulty making friends (given considerable weight); (9) Robinson's family had a history of mental health problems (given some weight); (10) Robinson obtained a G.E.D. while in a juvenile facility (given minuscule weight); (11) Robinson was a model inmate (given very little weight); (12) Robinson suffered extreme duress based on fear of returning to prison because where he was previously raped and beaten (given some weight); (13) Robinson confessed to the murder and assisted police (given little weight); (14) Robinson admitted several times to having a drug problem and sought counseling (given no additional weight to that already given for history of drug abuse); (15) the justice system failed to provide requisite intervention (given no additional weight to that already given for history of drug abuse); (16) Robinson successfully completed a sentence and parole in Missouri (given minuscule weight); (17) Robinson had the ability to adjust to prison life (given very little weight); and (18) Robinson had people who loved him (given extremely little weight).

APPEAL
Robinson filed this appeal and raises seven issues for our review.[4] Of Robinson's seven claims, only four warrant discussion.
In his first claim, Robinson argues the trial court erred in denying his counsel's oral motion to withdraw his guilty plea. We disagree. The First District Court of Appeal in Yesnes v. State, 440 So.2d 628 (Fla. 1st DCA 1983), analyzed the requirements for withdrawing pleas:

*274 Rule 3.170(f), Florida Rules of Criminal Procedure, provides that "the court may, in its discretion, and shall upon good cause, at any time before a sentence, permit a plea of guilty to be withdrawn" (emphasis supplied). The burden is upon a defendant to establish good cause under the rule, and use of the word "shall" indicates that such a showing entitles the defendant to withdraw a plea as a matter of right. Use of the word "may," however, suggests that the rule also allows, in the discretion of the court, withdrawal of the plea in the interest of justice, upon a lesser showing than good cause. In any event, this rule should be liberally construed in favor of the defendant. Adler v. State, 382 So.2d 1298, 1300 (Fla. 3d DCA 1980). The law inclines toward a trial on the merits; and where it appears that the interests of justice would be served, the defendant should be permitted to withdraw his plea. Morton v. State, 317 So.2d 145, 146 (Fla. 2d DCA 1975). A defendant should be permitted to withdraw a plea "if he files a proper motion and proves that the plea was entered under mental weakness, mistake, surprise, misapprehension, fear, promise, or other circumstances affecting his rights" (emphasis supplied). Baker v. State, 408 So.2d 686, 687 (Fla. 2d DCA 1982).
Id. at 634. In order to show cause why the plea should be withdrawn, mere allegations are not enough; the defense must offer proof that the plea was not voluntarily and intelligently entered. See Gore v. State, 552 So.2d 1185, 1186 (Fla. 5th DCA 1989); Brown v. State, 428 So.2d 369, 371 (Fla. 5th DCA 1983) ("[M]ere naked allegations contained in a motion to withdraw, unsupported by any proof, can never constitute a basis for withdrawal of a plea."). Further, on appeal from the denial of the motion to withdraw the plea, the burden rests on the defendant to show the trial court abused its discretion in denying the defendant's motion. See Hunt v. State, 613 So.2d 893, 896 (Fla.1992); Porter v. State, 564 So.2d 1060, 1063 (Fla.1990) (quoting Lopez v. State, 536 So.2d 226, 228 (Fla.1988)).
At the new penalty phase proceeding, Robinson's counsel orally moved to withdraw Robinson's guilty plea on the ground that "Robinson was not able to form an intelligent waiver of his rights." No further explanation was offered as to why Robinson could not form an intelligent waiver. The trial judge denied the motion, stating, "I can remember the plea, where he told us why he did what he did and he appeared very confident to me." Robinson did not move for rehearing or attempt to further argue to the court reasons why his initial plea was not intelligently made.
We find no error in the trial court's denial of Robinson's motion. Indeed, the record conclusively refutes Robinson's claim that he was unable to form an intelligent waiver of his right to a trial. The record reflects that Robinson's plea was only accepted after an extensive inquiry. At the plea colloquy, the trial court asked Robinson whether he intended to plead guilty to first-degree murder and informed Robinson that the only possible sentences upon conviction for first-degree murder were death and life in prison. The trial court then questioned Robinson extensively about his background and the factual circumstances of the murder. Robinson explained to the trial court that he would rather be punished by death than sentenced to life in prison. Further, defense counsel notified the court that Robinson had been examined by medical experts and it was their opinion that Robinson was competent to proceed. In addition, both defense counsel and the State questioned Robinson to make sure that he understood that defense counsel had investigated mitigating evidence and that counsel was prepared to present such evidence on his behalf. Robinson stated that he understood but that he did not want to present any mitigating evidence. Finally, the state attorney told Robinson that he intended to seek the death penalty in this case. The record thus indicates that Robinson voluntarily *275 and intelligently waived his right to a trial. He has failed to demonstrate why such plea should be withdrawn. Accordingly, we find no error.
Robinson's reliance on Gunn v. State, 643 So.2d 677 (Fla. 4th DCA 1994), is misplaced. There the defendant pled guilty but before sentencing moved to withdraw the guilty plea. The trial court summarily denied the motion without giving the defendant an opportunity to argue reasons for the motion. The district court held that as a matter of fundamental due process, Gunn should have been given the opportunity to be heard on his motion to withdraw the plea. Id. at 679. Here, the trial court did not deny Robinson the opportunity to provide grounds for his motion. Rather, defense counsel moved to withdraw Robinson's plea without providing factual allegations in support of the motion. Contrary to Robinson's assertion, the record does not indicate that the trial court denied Robinson the opportunity to argue his motion. Rather, in denying the motion, the trial court recalled Robinson's plea and correctly found that his claim was conclusively refuted by the record.[5]

Neurological Testing
Next, Robinson claims the trial court erred in denying his request for neurological testing which would have provided additional insight into Robinson's brain damage. In support of this claim, Robinson points to our decision in Hoskins v. State, 702 So.2d 202 (Fla.1997), wherein we ordered a new penalty phase proceeding where the trial court improperly denied the defendant's request for a Positron Emission Tomography (PET) scan. In Hoskins, the expert testified that the test would be necessary to complete his opinion because the test would render a more definite determination of brain damage. Consequently, we held it was error to deny the motion for the PET scan and remanded the case with instructions to the trial court to consider whether the expert's opinion would change after Hoskins was tested. Id. at 209-10. We also held that if the court found that the expert's opinion changed based solely on the PET scan results, Hoskins was to be afforded a new penalty phase proceeding. Id. at 210.[6]
Here, the defense requested a SPECT scan. The trial court initially approved the expenditure of $500 for the cost of the SPECT scan and the defense scheduled the test for July 14, 1997. At a hearing on July 1, 1997, prior to the date of testing, the State argued that neither of the defense experts were qualified to interpret the results of the SPECT scan and the scan is not generally accepted within the scientific community. The trial judge then changed her mind and denied the request for the SPECT scan because of the possibility of further delay in commencing the penalty phase proceeding and the "ramifications and the repercussions and the uncertainty of the test."
We find no error in the trial court's denial of Robinson's request for the SPECT scan because he has failed to establish any need for such test. According to Dr. Upson, the SPECT scan is used to locate the existence of possible brain damage. Both medical experts testified that Robinson suffers from apparent brain damage in the left temporal lobe. As the State points out, unlike the expert in Hoskins, neither doctor testified that the test was necessary to complete their medical *276 opinion; they merely stated that the exam would have been helpful.[7] Thus, the results of the exam would have merely confirmed the doctors' already established opinions, which were substantially accepted by the trial court. Further, according to Dr. Lipman, the scan does not indicate how well a person with possible brain damage functions. He stated that neuropsychological instruments, such as the battery of tests conducted on Robinson, are better at determining the degree in which a person is able to function with brain deficits. Thus, Robinson has failed to make an adequate showing of need for the neurological test requested in this case.[8] We find no error in the trial court's ruling.

Proportionality
Finally, Robinson contends that death is a disproportionate penalty in this case. He further argues that the trial court failed to consider or gave improper weight to the mitigating evidence, especially the evidence that he suffers from brain damage. We disagree.
The weight given to each mitigating factor is a matter which rests within the discretion of the trial court. See Campbell v. State, 571 So.2d 415, 420 (Fla. 1990). Here, the trial judge meticulously identified each mitigating circumstance presented by the defense and stated her conclusion as to each mitigator, supplying facts and reasoning for her conclusions. With regard to the evidence of brain damage, the trial court stated:
He had a difficult delivery with forceps (so did his brother). At age 3 his umbilical cord attached to his intestine and he was taken to the hospital. He lost blood and consciousness, but recovered. At age 6 he was diagnosed Attention Deficit Disorder (ADD), and was put on 60 milligrams of Ritalin a day. He was on that until, at age 9, he went to a private school that required he be taken off Ritalin. He was, and did well. At age 6 or 7 he almost drowned when a friend tied him up and put him under water like Harry Houdini. His mother saw this and was able to pull him out of the pool and revive him herself. She said he was unconscious when she pulled him out and could have suffered a loss of oxygen. He did not go to the hospital. He began drinking alcohol at age 8; taking drugs at age 14. Later he had a bicycle accident in which he was hit by a car when he had run away from a drug treatment facility in Ocala. He had an injury to the back of his head. He was treated at the Emergency Room. Later he had a job painting the inside of a water tower. He breathed the fumes and there was toxic exposure. He went into convulsions and was unconscious. He was hospitalized. There is no evidence that any one of these injuries or a combination of them caused any permanent brain damage to the extent it would affect his behavior significantly. Dr. Upson said it is more likely that his lifestyle and drugs caused the Defendant's problems. Because he has some frontal lobe damage, this mitigator is given little weight as there is insufficient evidence that it caused the Defendant's conduct.
The trial judge also offered the following summary of her findings:
SUMMARY OF MITIGATORS: When the dust settles, it is clear that Michael Robinson is a sociopath. The doctors have put the best spin on the test results. There is no doubt that the Defendant has had problems since very early in his life. His homelife was not perfect, *277 but it was not so far from the norm of that day that it explains or justifies the Defendant's aberrant behavior for the past 20 plus years. Perhaps his failure to bond from the very beginning led to his sociopathic personality disorder. If so, none of his accidents or injuries are really relevant. In fact Dr. Upson said he could have mild brain damage or he could be normal. If there were brain damage, he does not know how or if it would have affected his behavior. The doctors also cannot say that any or a combination of his injuries could be responsible for his behavior. Everyone can agree that his extensive drug abuse/addiction is a primary problem and has led to his misconduct. Because his father was an alcoholic, some credence was given to the possibility of his addiction being hereditary. His drug addiction, together with his sociopathic personality disorder are the two primary mitigators and they are weighted heavily. Many of the other mitigators enumerated by the defense were merely offshoots of these two.
We find no abuse of discretion in the trial court's treatment and consideration of the mitigating circumstances. Clearly, the existence of brain damage is a factor which may be considered in mitigation. See DeAngelo v. State, 616 So.2d 440, 442 (Fla.1993). Here, the experts opined that Robinson's tests results indicated the existence of brain damage. However, Dr. Lipman testified that while Robinson's particular brain deficits would interfere with his daily life, "it wouldn't be of a degree that would necessarily keep him from functioning in normal, everyday society." Further, neither expert could determine what caused the brain impairment. Although the trial court gave little weight to the existence of brain damage because of the absence of any evidence that it caused Robinson's actions on the night of the murder, the sentencing order clearly reflects that the trial court considered the evidence and weighed it accordingly. The fact that Robinson disagrees with the trial court's conclusion does not warrant reversal. See James v. State, 695 So.2d 1229, 1237 (Fla.) (noting that "[r]eversal is not warranted simply because an appellant draws a different conclusion"), cert. denied, 522 U.S. 1000, 118 S.Ct. 569, 139 L.Ed.2d 409 (1997).
Upon review, we find that death is the appropriate penalty in this case. In reaching this conclusion, we are mindful that this Court must consider the particular circumstances of the instant case in comparison with other capital cases and then decide if death is the appropriate penalty. See Sliney v. State, 699 So.2d 662, 672 (Fla.1997) (citing Terry v. State, 668 So.2d 954, 965 (Fla.1996)), cert. denied, 118 S.Ct. 1079 (1998); Livingston v. State, 565 So.2d 1288, 1292 (Fla.1988). Proportionality review is not simply a comparison between the number of aggravating and mitigating circumstances. Terry, 668 So.2d at 965. Following these established principles, it appears the death sentence imposed here is not a disproportionate penalty compared to other cases.[9]See *278 Spencer v. State, 691 So.2d 1062 (Fla. 1996); Foster v. State, 654 So.2d 112 (Fla. 1995).
In Spencer, the defendant was convicted of first-degree murder for the fatal beating and stabbing of his wife. We initially reversed his sentence of death because the trial court improperly considered the CCP aggravator and improperly disregarded evidence of mental mitigation. See Spencer v. State, 645 So.2d 377 (Fla.1994). On appeal following remand, we affirmed Spencer's sentence of death based on the existence of two aggravating factors-previous conviction of a violent felony and HAC-and despite the existence of two of the mental statutory mitigating factors and a number of nonstatutory mitigating factors, including drug and alcohol abuse, paranoid personality disorder, sexual abuse by his father, honorable military record, good employment record, and ability to function in structured environment. See Spencer, 691 So.2d at 1063, 1064-65. We noted that the trial court did not give the mitigating evidence "overwhelmingly great weight" due to the other evidence at trial, the facts leading up to the murder, and the nature of the killing. Id. at 1064-65.
In Foster, we upheld the defendant's sentence of death based on his conviction of murder for the brutal beating and stabbing of the victim. 654 So.2d at 114. The trial court found three aggravating factors-the murder was committed while the defendant was engaged in a robbery, the murder was HAC, and the murder was CCP. The trial court also found fourteen nonstatutory mitigating factors to exist which it gave little weight: (1) the defendant murdered the victim while under the influence of emotional or mental disturbance-not extreme emotional or mental disturbance; (2) the defendant's capacity to conform his conduct to the requirements of the law was impaired-not substantially impaired; (3) abusive family background; (4) poverty; (5) the defendant's physical illness; (6) the defendant's love for and by his family; (7) alcohol and drug addiction; (8) troubled personal life; (9) physical injuries; (10) lack of childhood development; (11) struggle with death of loved ones; (12) learning disabilities; (13) potential for positive sustained human relationships; and (14) remorse for the crime. We held that compared to other capital cases, death was proportionate. Id.
In the instant case, both experts agreed that while Robinson suffers from mild brain damage, it would not prevent him from functioning normally within everyday society. Moreover, although Robinson chronically abused drugs from a young age, there was no evidence that Robinson had consumed drugs or alcohol on the day of the murder. According to Robinson's statement during the plea colloquy, he had consumed drugs "days" before the murder. While Dr. Lipman testified that certain drugs present residual effects lasting for days after the drugs are actually taken, both doctors admitted that Robinson knew what he was doing at the time of the murder. This conclusion is supported by the fact that before killing the victim, Robinson admitted that he calmly and deliberately waited until she was sleeping and then coldly bludgeoned her to death with a drywall hammer. After killing the victim, Robinson took steps to conceal his crime by burying the victim and lied to the police about who committed the crime. Although drugs admittedly consumed Robinson's life and he apparently suffered some residual effects from chronic drug abuse, the evidence indicates Robinson acted according to a deliberate plan and was fully cognizant of his actions on the night of the murder. Compared to other similar cases in which we upheld the sentence of the death, see Spencer; Foster, we find that death is proportionate to the facts in this case.
*279 Accordingly, we affirm Robinson's sentence of death.
It is so ordered.
HARDING, C.J., and SHAW, WELLS, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
NOTES
[1] The mitigating evidence initially proffered to the court is set forth in great detail in Robinson v. State, 684 So.2d 175, 179 (Fla. 1996).
[2] Dr. Upson and Dr. Lipman are not the same doctors initially appointed in this case. At the first penalty proceeding, the court appointed Dr. Kirkland and Dr. Berland to examine Robinson for competency and for mitigating evidence. Although neither doctor was called to testify at the new penalty phase hearing, their evaluations were considered by the trial court.
[3] We note that Dr. Upson questioned whether Robinson was "substantially" impaired: "The word `substantially' is difficult to deal with. I definitely think it was impaired. I think he knew what he was doing, but I don't think he could stop himself from doing it." According to Dr. Upson, Robinson experienced emotional distress and impaired capacity due to drug abuse, as well as fear of returning to prison.
[4] These claims are: (1) the trial court erred in denying Robinson's motion to withdraw his guilty plea; (2) the trial court erred in denying Robinson's motion for neurological testing; (3) the trial judge made prejudicial comments on the record and denied Robinson additional funds with which to investigate mitigating evidence; (4) the sentence of death is disproportionate; (5) the trial court erred in finding the murder was committed for pecuniary gain; (6) the trial court erred in finding the murder was committed to avoid arrest; and (7) the trial court erred in finding the murder was cold, calculated and premeditated (CCP). We find no merit to claim (3). None of the alleged comments by the trial judge indicated bias or prejudice against the defense, and the record indicates that the trial court granted all of Robinson's requests for appointment of experts and additional funds with which to investigate mitigating evidence. We likewise find no merit to claims (5), (6), and (7). Robinson challenged these same three aggravating factors in his initial appeal to this Court on the same grounds he asserts in this appeal. In our initial opinion, we found his claims to be without merit. Robinson, 684 So.2d at 179 n. 6. Upon reconsideration in light of the new evidence presented in mitigation during resentencing, we again find no merit to Robinson's challenges to the aggravating factors. Accordingly, we reject claims (5), (6), and (7) without further discussion.
[5] We find no merit to Robinson's subclaim that he will be denied the benefit of his bargain if he is not allowed to change his plea. Robinson pled guilty and specifically demanded the death penalty. The fact that this Court initially reversed his sentence of death does not deny him the right to seek imposition of the death penalty. He may still do so. It appears that he merely changed his mind and no longer wishes to die.
[6] On return to this Court after the trial court's determination, we ordered a new penalty phase proceeding but did not reach the issue of whether the PET scan results would be admissible evidence at the proceeding. See Hoskins v. State, 735 So.2d 1281, 1281 n. 1 (Fla.1999).
[7] We also note that at a presentencing hearing, defense counsel stated that Dr. Upson requested the exam merely to confirm his conclusions. However, the defense did not mention what those conclusions were.
[8] In so concluding, we offer no opinion as to whether such tests should be conducted. Nor do we wish to be interpreted as foreclosing the use of such tests in other cases. Obviously, every case is different. We merely hold that, in this case, there has been an insufficient showing of need for such tests.
[9] The cases cited by Robinson are inapposite. In Kramer v. State, 619 So.2d 274 (Fla.1993), we reversed the sentence of death where the evidence suggested nothing more than a fight between a disturbed alcoholic and a man who was legally drunk. In Knowles v. State, 632 So.2d 62 (Fla.1993), White v. State, 616 So.2d 21 (Fla.1993), and Nibert v. State, 574 So.2d 1059 (Fla.1990), we reversed the sentences of death where there was only one aggravating factor and substantial mental mitigation. Finally, we reversed the sentences of death in Livingston and Fitzpatrick v. State, 527 So.2d 809 (Fla.1988), based on the existence of several mitigating factors and the defendants' age or low emotional age. The defendant in Livingston was seventeen at the time of the offense, had been physically abused as a child, and possessed marginal intellectual functioning, at best. Similarly, we rejected the sentence of death in Fitzpatrick, despite the existence of five aggravating factors, where Fitzpatrick's emotional age was between nine and twelve years and his actions "were those of a seriously emotionally disturbed man-child, not those of a cold-blooded, heartless killer." Further, a neurologist testified that Fitzpatrick suffered extensive brain damage. Finally, we noted that both the heinous, atrocious, or cruel (HAC) and CCP aggravators were conspicuously absent. 527 So.2d at 812.