783 So.2d 980 (2001)
Glen Edward ROGERS, Appellant,
v.
STATE of Florida, Appellee.
No. SC91384.
Supreme Court of Florida.
March 1, 2001.
Rehearing Denied April 24, 2001.
*984 James Marion Moorman, Public Defender, and A. Anne Owens, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
*985 Robert A. Butterworth, Attorney General, and Robert J. Landry, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Glen Edward Rogers. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the judgment and sentence.

FACTS
Rogers was convicted of first-degree murder, armed robbery, and grand theft of a motor vehicle and sentenced to death for the brutal stabbing of Tina Marie Cribbs in a Tampa motel room. Cribbs was last seen alive leaving the Showtown Bar in Tampa with Rogers on Sunday, November 5, 1995. A bartender testified that Rogers arrived at the bar around 11 a.m. Cribbs and three female friends arrived a few hours later. Rogers purchased the women a round of drinks and introduced himself to several bar patrons as "Randy." Rogers informed Cribbs and her friends that he had no interest in married women or women with boyfriends. Rogers asked Cribbs, the only single woman of the group, for "a ride" and she agreed. Upon leaving the bar with Rogers, Cribbs told one of her friends that she would be back in fifteen or twenty minutes to meet her mother.
When Cribbs' mother, Mary Dicke, arrived twenty minutes later to meet her daughter as they had planned, Cribbs had not yet returned. Dicke waited for her daughter at the bar for nearly an hour and a half. Then Dicke began paging Cribbs, but received no response despite thirty pages. According to Dicke, it was unusual for her daughter not to return her calls. The next morning, Cribbs did not show up for work.
A motel clerk testified that Rogers had arrived at the motel by cab on Saturday, November 4, 1995. Rogers told the motel clerk that he was a truck driver whose truck had broken down. At that time, Rogers paid for a two-night stay. A desk clerk testified that Rogers returned to the motel office on Sunday evening, November 5, 1995. Shortly before Rogers entered the motel office, the clerk had observed Rogers with two suitcases near his motel room. According to the clerk, it appeared as if Rogers was packing a white Ford Festiva automobile. Rogers then entered the motel office, paid for an additional night's stay at the motel, informed the clerk that he did not want anyone going into his room, and requested a "Do Not Disturb" sign. When the clerk informed Rogers that the motel did not have such signs, Rogers requested that the clerk leave a note for the cleaning crew not to enter and clean his room. The next morning, at approximately 9 a.m., the clerk saw Rogers leaving the motel alone in the same white automobile. The evidence at trial established that the white vehicle belonged to Cribbs.
On Tuesday, November 7, 1995, a cleaning person at the motel went into the room that Rogers had rented. The cleaning person noticed a handwritten "Do Not Disturb" sign hanging on the doorknob.[1] She testified that she had observed the same sign hanging on the door on Monday morning and thus did not enter the room to clean it. Upon entering the room on Tuesday, the cleaning person found Cribbs' body in the bathroom. Cribbs was found lying on her back in the bathtub. *986 She was clothed, wearing a damp T-shirt, underwear, and socks. On the bathroom floor, authorities found a damp pile of clothes and bloodstained towels. A pager and black wristwatch were lying at Cribbs' feet in the bathtub. Although Cribbs' mother testified that her daughter habitually wore a sapphire and diamond square ring and a gold heart-shaped watch, no such jewelry was recovered from Cribbs' body.
The State's forensic pathologist estimated that Cribbs could have been dead for one to three days before she was found. He testified that Cribbs died as a result of two stabs wounds, one to the chest and one to the buttocks. In addition to these injuries, Cribbs had several bruises and abrasions, and a shallow wound to her left arm, which the pathologist believed was a defensive wound. The evidence showed that Cribbs had been wearing her clothing when she was stabbed.
A senior forensic serologist with the Florida Department of Law Enforcement ("FDLE") also testified for the State. He found no evidence of semen in Cribbs' body. An FBI agent who was an expert in the field of forensic serology also testified that the blue jean shorts and T-shirts found in the motel bathroom tested positive for blood. In addition, a biological forensic examiner for the DNA unit of the FBI testified that neither Cribbs nor Rogers could be excluded as a contributor to the blood stains on the jean shorts. He also stated that Rogers was a potential contributor to the DNA samples found on a T-shirt recovered from Cribbs' vehicle.
The State established through the testimony of maintenance workers that Cribbs' wallet was found early in the afternoon of Monday, November 6, 1995, at a rest area on Interstate-10 ("I-10") near Tallahassee, Florida. A crime lab analysis revealed that two latent fingerprints belonging to Rogers were inside the wallet. Fingerprints lifted from the motel room also matched Rogers' fingerprints.
Rogers was eventually apprehended in Kentucky on November 13, 1995, a week after Cribbs was murdered. After being informed that Rogers was in the area, Detective Robert Stephens saw Rogers driving a white Ford Festiva and requested back-up. A high speed chase ensued, and during this pursuit, Rogers threw beer cans at the pursuing officers as he tried to elude them. Authorities set up a roadblock and successfully forced Rogers off the roadway.
A subsequent inventory of Cribbs' vehicle revealed a substantial amount of food, a cooler, a duffel bag, a comforter, two pillows, Mississippi and Florida license plates, a key to the motel room where Cribbs' body was found, and a bloodstained T-shirt. A small smear on the inside driver's door tested positive for blood. Police also found a pair of blue jeans, which contained blood.
During an interview with Kentucky Police, Rogers claimed that "a girl," whom he could not describe, loaned him the vehicle. Rogers stated that he met the "girl" in a bar and brought her to his motel room. After dropping the "girl" off at the motel, Rogers left to get some beer and cigarettes. According to Rogers, the "girl" was alive when he left and Rogers claimed that he never returned, or intended to return, to the motel. This statement contradicted the testimony of the motel desk clerk, who testified that he saw Rogers leaving the motel on Monday morning. When the investigating officer stated that he just wanted Rogers to tell the truth, Rogers replied, "I can't tell you the truth."
In his defense, Rogers attempted to establish that someone else was the perpetrator of Cribbs' murder. First, the defense introduced the testimony of Tampa police officers who stated that the surrounding area of the motel was a high *987 crime area and that many of the residents of that motel and the motel located across the street had criminal records. The defense established that the Tampa Police did not investigate any of these individuals as potential suspects in the murder. According to the defense, this supported the defense's theory that the Tampa police "rushed to judgment" in this case.
Second, the defense called another highway maintenance worker who testified that Cribbs' wallet was not recovered on Monday afternoon, but that it was found around 10:30 a.m. According to the defense, the time the wallet was found was crucial because if Rogers had left the Tampa area at 9 a.m., as the motel desk clerk testified, he could not have disposed of the wallet at the highway rest stop near Tallahassee any earlier than 1 p.m.
Finally, the defense also called several expert witnesses, including Dr. John Feegel, a forensic pathologist, consulting medical examiner and practicing attorney. Doctor Feegel estimated that Cribbs died approximately twenty-nine or thirty hours before she was found. Contrary to the State expert's estimate, Dr. Feegel opined that it was unlikely that Cribbs had been dead for forty-eight hours before her body was discovered.
Rogers was convicted on all charges and, at the conclusion of the penalty-phase proceedings, the jury unanimously recommended the death penalty. The trial court accepted the jury's recommendation and sentenced Rogers to death. The trial court found two aggravating circumstances: (1) that the murder was committed for pecuniary gain; and (2) that the murder was heinous, atrocious, or cruel ("HAC"). The court found one statutory mitigating circumstancethat Rogers' capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (some weight). The court also found the following nonstatutory mitigating circumstances: (1) Rogers had a childhood deprived of love, affection or moral guidance and lacked a moral upbringing of good family values (slight weight); (2) Rogers' father was an alcoholic who physically abused Rogers' mother in the presence of Rogers and his siblings (slight weight); (3) Rogers was introduced to controlled substances at a young age and encouraged by his older brother to participate in burglaries (slight weight); (4) Rogers has been lawfully and gainfully employed at various times in his adult life (slight weight); (5) Rogers was solely responsible for the care of his two children at one time in his adult life (slight weight); and (6) Rogers had been drinking alcohol for a few hours on the day he came into contact with the victim (little weight).
On appeal, Rogers raises ten issues.[2] We address each of these issues.

*988 GUILT PHASE ISSUES

A. Motion for Judgment of Acquittal
In his first point on appeal, Rogers contends that the trial court erred in failing to grant his motion for judgment of acquittal because the State failed to present sufficient evidence to support a premeditated or felony murder conviction.[3] A motion for judgment of acquittal should be granted in a circumstantial evidence case if the State fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. See Orme v. State, 677 So.2d 258, 261-62 (Fla. 1996).
[The court's] view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events.
State v. Law, 559 So.2d 187, 188-89 (Fla. 1989) (citations omitted). The trial court's finding denying a motion for judgment of acquittal will not be reversed on appeal if there is competent substantial evidence to support the jury's verdict. See Orme, 677 So.2d at 262.
We first examine Rogers' contention that the trial court erred in failing to grant a judgment of acquittal on the first-degree murder charge because the State failed to present sufficient evidence to support either premeditated or felony murder. "Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill." Green v. State, 715 So.2d 940, 943 (Fla.1998). This purpose to kill must exist for such a time before the homicide "to permit reflection as to the nature of the act to be committed and the probable result of that act." Id. at 944. Premeditation can be shown by circumstantial evidence. See Woods v. State, 733 So.2d 980, 985 (Fla.1999). Whether the State's evidence fails to exclude all reasonable hypotheses of innocence is a question of fact for the jury. See Cochran v. State, 547 So.2d 928, 930 (Fla.1989). As this Court has stated:
Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.
Green, 715 So.2d at 944.
Citing Jimenez v. State, 703 So.2d 437, 440 (Fla.1997), and Preston v. State, 444 So.2d 939, 944 (Fla.1984), the State contends that the deliberate use of a knife to stab a victim multiple times in vital organs is sufficient evidence to support a finding of premeditation in this case. However, relying on Kirkland v. State, 684 So.2d 732, 734-35 (Fla.1996), and Green, 715 So.2d at 944, Rogers contends that the evidence that the victim had been repeatedly stabbed is insufficient evidence supporting the State's allegation that Rogers committed premeditated murder. Despite Rogers' assertions, we find Rogers' reliance on Kirkland and Green is misplaced.
*989 In Kirkland, the fact that the victim's death was caused by a "very deep, complex, irregular wound of the neck," did not in itself support premeditation. 684 So.2d at 734-35. According to the Court, premeditation could not be established in light of the "strong evidence militating against a finding of premeditation," including the fact that there was "no suggestion that Kirkland exhibited, mentioned, or even possessed an intent to kill the victim at any time prior to the actual homicide" and where "Kirkland had an IQ that measured in the sixties." Id. at 735; see Green, 715 So.2d at 944 (finding that the State's evidence was insufficient to establish premeditated murder where "there was little, if any, evidence that Green committed the homicide according to a preconceived plan" and where Green's intelligence was "exceedingly low").
In contrast to Kirkland and Green, the deliberate nature of the two wounds in this case is particularly compelling evidence of premeditation. Cribbs died as a result of two stab wounds, one to her chest and the other to the right buttock. The fatal wounds were 8.5 and 9 inches deep. In each stab wound, the knife had been twisted ninety degrees causing an L-shaped wound. The pathologist testified that the wound to the buttocks had the same L-shape and was inflicted in precisely the same manner as the wound to the chest. The pathologist testified to his opinion that the instrument was inserted; then after an interval, twisted and pulled out. Thus, the unusual nature of the two almost identically shaped and inflicted knife wounds demonstrates that the victim was carefully stabbed in a deliberate manner in order to effect her death.
In addition to the deliberate nature of these stab wounds, other circumstances are present in this case that support a finding that the killing was the result of a preconceived plan. The State's theory was that Rogers' primary motive in killing Cribbs was to steal her property, especially her vehicle. This theory is supported by multiple circumstances that occurred both before and after the murder. At the time Rogers met Cribbs, Rogers had no motor vehicle. Witnesses testified that Rogers arrived at both the bar and the motel by cab. Evidence also showed that Rogers introduced himself to bar patrons using an assumed name and began soliciting people for "a ride." According to trial testimony, Rogers was looking for transportation because he needed to "get some money." After Rogers purchased Cribbs and her friends several rounds of drinks, Cribbs agreed to give Rogers "a ride." Rogers and Cribbs thereafter left the bar together. This was the last time that Cribbs was seen alive.
At approximately 9:30 p.m. Sunday evening, a motel clerk observed Rogers placing luggage near Cribbs' vehicle. The next morning at around 9 a.m., the motel clerk noticed Rogers leaving the motel in the victim's car. At the time Rogers was apprehended in Kentucky a week after the murder, Rogers was still driving and appeared to be living in Cribbs' vehicle.
These additional circumstances provide competent substantial evidence to support the denial of the motion for judgment of acquittal on the charge of first-degree murder and also support a finding on the alternative ground of felony murder predicated on robbery. Robbery is "the taking of money or other property which may be the subject of larceny from the person or custody of another when in the course of the taking there is the use of force, violence, assault, or putting in fear." § 812.13(1), Fla.Stat. (1995). This Court addressed the standard for establishing a robbery in Jones v. State, 652 So.2d 346, 349-50 (Fla.1995). Property that is the subject of the taking need not be in the *990 actual physical possession or immediate presence of the person who was robbed. See id. at 350. Property is taken from "the person or custody of another" if it is sufficiently under the victim's control so that the victim could have prevented the taking if he or she had not been subjected to the violence or intimidation by the robber. See id. Under section 812.13(3)(b), Florida Statutes (1989),[4] the violence or intimidation may occur prior to, contemporaneous with, or subsequent to the taking of the property so long as both the act of violence or intimidation and the taking constitute a continuous series of acts or events. See Jones, 652 So.2d at 349. The taking of property after a murder, however, does not constitute robbery if the motive for the murder was not the taking of property. See Mahn v. State, 714 So.2d 391, 397 (Fla.1998) (citing Knowles v. State, 632 So.2d 62, 66 (Fla.1993), and Parker v. State, 458 So.2d 750, 754 (Fla. 1984)).
In addition to the evidence regarding the taking of the motor vehicle, a witness testified that Cribbs always carried her wallet and purse. Testimony also demonstrated that Cribbs habitually wore jewelry, including a sapphire, a diamond, and a Mother's Day ring, as well as a gold heart-shaped watch. No such items were recovered from the crime scene. However, the victim's wallet was recovered in a trash can at a rest area on I-10 hours after Rogers had fled the motel in Cribbs' car. Although the wallet did not contain any money, it did contain two fingerprints matching Rogers' fingerprints.
Finally, we reject Rogers' assertion that the evidence demonstrates that the killing was a result of a sexual relationship gone awry and not the result of premeditation. In addition to the affirmative evidence of both premeditation and felony murder based on robbery, there is little evidence to support Rogers' hypothesis that the murder occurred in a frenzy following a sexual encounter. Cribbs was found with her clothes on in the bathtub with two deliberately inflicted stab wounds and there is no evidence of any semen in the victim's body or any indication of a sexual encounter. Accordingly, there was competent substantial evidence to support a conviction for first-degree murder based on either premeditation or felony murder and the trial court did not err in failing to grant Rogers' motion for a judgment of acquittal.

B. Motion to Disqualify the State Attorney's Office
We next address Rogers' claim that the trial court erred by denying the defense's motion to disqualify the Hillsborough County State Attorney's Office after investigators with the State Attorney's Office were instructed by prosecutors to conduct a warrantless search of Rogers' jail cell a week before trial, during which they seized documents including Rogers' personal papers related to this case. As a result of the warrantless search and seizure, defense counsel filed a motion to suppress the evidence seized from Rogers' cell and to disqualify the Hillsborough County State Attorney's Office from prosecuting Rogers.
Prior to trial, the trial court conducted a formal evidentiary hearing on the matter. Rogers' counsel told the court that the boxes seized by authorities contained work product of the attorney-client relationship. Rogers' attorney alleged that the search was illegal because it was not a "shakedown" search by jail personnel for security purposes. Rather, Rogers' attorney argued *991 that Rogers had a minimal Fourth Amendment right as a pretrial detainee and that the search was done strictly for investigative purposes of confiscating incriminating evidence to be used against Rogers at trial. Rogers claimed that the search and seizure violated his Fourth Amendment expectation of privacy, his Sixth Amendment right to counsel, and his Fifth Amendment right to access to courts and protection against deprivation of property without due process of law. Rogers' attorney argued that the seized documents had, at that time, been in the possession of the State for a week and that the State could not "put the horse back in the barn once you let him out."
According to the State, investigators were not seeking information to incriminate Rogers in the pending prosecution involving Cribbs' murder. Rather, prosecutors were investigating Rogers and other inmates' involvement in a conspiracy to blame the murder on another prisoner. The State advised that none of the seized items had been viewed by anyone in the State Attorney's Office.
During the hearing, Assistant State Attorney Karen Cox stated that she did not think that a warrant was necessary because Rogers did not have a reasonable expectation of privacy in jail and because Rogers was a high-security prisoner subject to a jail shakedown once a day on a random basis, relying on Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), and State v. Bolin, 693 So.2d 583 (Fla. 2d DCA 1997). At the conclusion of the evidentiary hearing, the trial court found that Rogers had not shown prejudice because "all the documents are being returned.... I am finding at this time that none of those documents have been reviewed by any member of the State Attorney's Office or any other law enforcement agency and they are going to be returned to Mr. Rogers." The trial court further ordered that "none of those documents or any fruits from those documents will be used at this trial." The trial court denied the "Motion for Disqualification of the State Attorney's Office based upon the findings of the court that there has been no disclosure of attorney/client privilege in this case and there will be no disclosure of attorney/client privilege in this case."
In order to prevail on a motion to disqualify all members of the State Attorney's Office from prosecuting a case, "the defendant must point to some prejudice to him which results from the office's participation in the prosecution." State v. Clausell, 474 So.2d 1189, 1190 (Fla.1985). "[A]lthough we have stated that the appearance of impropriety created by certain situations may demand disqualification, we have evaluated such situations on a case-by-case basis." Bogle v. State, 655 So.2d 1103, 1106 (Fla.1995). For instance, in Reaves v. State, 574 So.2d 105, 107-08 (Fla.1991), the Court determined that the appearance of impropriety mandated that the defendant be given a new trial because the prosecutor in the case had previously represented the defendant in another matter and had access to privileged information. Likewise, in Castro v. State, 597 So.2d 259, 260-61 (Fla.1992), the Court held that personal assistance to the prosecution by a defendant's prior counsel created a sufficient appearance of impropriety to warrant a new penalty hearing for the defendant, even though there was no evidence demonstrating that the attorney actually disclosed confidential information.
In this case, Rogers has failed to establish the requisite prejudice, and therefore we do not find that disqualification of the State Attorney's Office was required. Nevertheless, the conduct of the prosecutors of the Hillsborough County State Attorney's Office who ordered *992 investigators of that office to engage in a search of Rogers' cell and seize his personal papers was clearly improper.
We emphasize that neither the United States Supreme Court's opinion in Hudson, nor the Second District's opinion in Bolin would have authorized such a search. See Hudson, 468 U.S. at 519, 104 S.Ct. 3194; Bolin, 693 So.2d at 584-85. In Hudson, an officer with a state correctional center conducted a "shakedown" search of a prisoner's locker and cell solely for the purpose of finding contraband. 468 U.S. at 519, 104 S.Ct. 3194. In Bolin, prison officers entered Bolin's cell for the purpose of investigating an attempted suicide by Bolin. See id. at 585. The Second District emphasized that the officer "did not come to the cell simply to find evidence that would bolster its case." Id.
In contrast to Hudson and Bolin, in this case, it was an investigator with the State Attorney's Office who conducted the search and seized the documents in order to investigate an alleged conspiracy to pin the blame for the victim's murder on another person. Thus, the search was directly related to the case being prosecuted. As in McCoy v. State, 639 So.2d 163, 166-67 (Fla. 1st DCA 1994), there was no "legitimate" need to search Rogers' jail cell for institutional security and the search was directly related to the case being prosecuted. Similar to McCoy, it was the prosecutors assigned to Rogers' case who directed investigators to perform a search of Rogers' cell, which included a search for any writings by Rogers that would be incriminating. See id. at 164.
The prosecutors' actions are of grave concern to this Court, carrying with them the potential to undermine the essential fairness of our system of justice based on an adversarial system with established procedures for gathering evidence and searching for the truth. Just as the prosecutors in this case could not have interrogated the defendant in his prison cell outside the presence of his attorney, so were the prosecutors or their representatives precluded from invading the defendant's cell without a warrant and seizing his personal papers and effects for purposes of gathering evidence. We emphasize this is not a case where the search was justified by prison security concerns and where the prison officials themselves deemed it necessary to search Rogers' cell. Cf. Hudson, 468 U.S. at 519, 104 S.Ct. 3194; Bolin, 693 So.2d at 584-85.
Nevertheless, as a result of the actions taken by the trial court to ensure that the papers seized were not used by the prosecution, we conclude that the interests of justice would not be served by reversal for a new trial on this basis. As the trial court found: (1) neither the prosecution nor the police involved in the case examined any of the seized documents retrieved from Rogers' cell; (2) all of the documents were returned to Rogers; and (3) the State did not use any of the seized evidence in the prosecution of Rogers. Accordingly, Rogers has not pointed to specific prejudice that resulted from the State Attorney's participation in the prosecution. See Clausell, 474 So.2d at 1190. Although we do not condone the prosecutors' actions, as in Farina v. State, 680 So.2d 392, 395-96 (Fla.1996), we find that the trial court did not abuse its discretion in declining to disqualify the Hillsborough County State Attorney's Office.

PENALTY PHASE ISSUES

A. Aggravating Circumstances
We next address the issues relating to the penalty phase. Rogers maintains that the evidence was insufficient to support the aggravating circumstances that the murder was heinous, atrocious, or cruel and that the murder was committed for pecuniary gain. Aggravators must be *993 proven beyond a reasonable doubt. See Geralds v. State, 601 So.2d 1157, 1163 (Fla. 1992). In reviewing a trial court's finding that an aggravating circumstance is applicable, it is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt that is the trial court's job. See Willacy v. State, 696 So.2d 693, 695-96 (Fla.1997). Rather, this Court's task is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding. See id.

1. Pecuniary Gain
In order to establish the aggravating factor of pecuniary gain, the State must prove beyond a reasonable doubt that the murder was motivated, at least in part, by a desire to obtain money, property, or other financial gain. See Finney v. State, 660 So.2d 674, 680 (Fla.1995); Clark v. State, 609 So.2d 513, 515 (Fla. 1992); Peek v. State, 395 So.2d 492, 499 (Fla.1980). The pecuniary gain aggravator is also applicable where the defendant's motivation for murder was to "improv[e his] financial worth." Allen v. State, 662 So.2d 323, 330 (Fla.1995); see Scull v. State, 533 So.2d 1137, 1142 (Fla.1988); Peek, 395 So.2d at 499. This Court has consistently found the pecuniary gain aggravating circumstance applicable in cases where the murder was committed during the forcible taking of an automobile. See Wyatt v. State, 641 So.2d 355, 359 (Fla. 1994); see also Lambrix v. State, 494 So.2d 1143, 1148 (Fla.1986) (finding murder committed for pecuniary gain where defendant killed the victim and proceeded to steal victim's car).
However, where a defendant kills a victim, steals the victim's car, and abandons the vehicle shortly after the murder, this Court has found that the State could not show that the defendant committed the murder for pecuniary gain. See Allen, 662 So.2d at 330; Scull, 533 So.2d at 1142; Peek, 395 So.2d at 499. Rather, under such circumstances, this Court has determined that the defendants likely stole the vehicles to facilitate their escapes from the murder scenes. See Allen, 662 So.2d at 330; Scull, 533 So.2d at 1142; Peek, 395 So.2d at 499.
As previously discussed in connection with the evidence supporting the robbery, we find that the same facts and circumstances that support robbery also support the trial court's finding that Rogers killed Cribbs for pecuniary or financial gain. See Finney, 660 So.2d at 684. Specifically, Rogers' primary motive for the murder appears to have been to obtain Cribbs' property and, in particular, her vehicle, money and other personal effects.
Furthermore, we reject Rogers' argument that he stole Cribbs' vehicle simply to facilitate his escape. Unlike the defendants in Allen, Scull, and Peek, Rogers never abandoned Cribbs' vehicle. Rather, the evidence showed that he was living in Cribbs' vehicle a week after the homicide. At the time of Rogers' arrest in Kentucky, authorities discovered a cooler full of food, a comforter, pillows, a duffel bag, and a suitcase inside the vehicle, which Rogers was still driving. Also, unlike the defendants in Allen, Scull, and Peek, Rogers did not flee from the crime scene immediately after killing Cribbs. The evidence showed that Rogers likely killed Cribbs on Sunday evening. However, he did not leave the motel until approximately 9 a.m. Monday morning. Also, upon his capture in Kentucky, Rogers informed authorities that after taking Cribbs' vehicle, he never intended to return the vehicle. Thus, the defense's theory that Rogers stole the victim's vehicle simply to facilitate his escape is inconsistent with the evidence. There-fore, *994 we affirm the trial court's ruling finding the pecuniary gain aggravating circumstance applicable.

2. HAC
Rogers also contends that the trial court erred in finding the HAC aggravating circumstance applicable in this case. In order for the HAC aggravating circumstance to apply, the murder must be conscienceless or pitiless and unnecessarily tortuous to the victim. See Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996). A finding of HAC is appropriate only when a murder evinces extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another. See Cheshire v. State, 568 So.2d 908, 912 (Fla.1990). This Court has consistently upheld the HAC aggravator in cases where: (1) the victim suffered multiple stab wounds, none of which caused instantaneous death, and proceeded to bleed to death; and (2) the wounds were inflicted while the victim was conscious and were intended to inflict a high degree of pain or where the defendant showed utter indifference to or enjoyment of the suffering of another. See Jimenez, 703 So.2d at 441; Finney, 660 So.2d at 685; Henry v. State, 649 So.2d 1366, 1369 (Fla. 1994); Suggs v. State, 644 So.2d 64, 70 (Fla.1994); Floyd v. State, 569 So.2d 1225, 1232 (Fla.1990). In addition, this Court has found the HAC aggravator applicable in cases where a defendant had killed a victim by "deliberately twist[ing] the knife blade during the stabbing." Merck v. State, 664 So.2d 939, 942 (Fla.1995); see Lusk v. State, 446 So.2d 1038, 1043 (Fla. 1984) (finding HAC where victim suffered three stab wounds in the back).
In the present case, the trial judge found:
Tina Marie Cribbs died as a result of two fatal stab wounds inflicted while she was conscious. One stab wound was in the buttock and the knife was driven in with such great force that the wound path was nine and one-half inches deep. While in her body, the knife was twisted ninety degrees before being pulled from its path. Tina Marie Cribbs was alive and conscious during the infliction of this fatal wound. The other stab wound was to her chest and was driven in with such force that the wound path was eight and one-half inches deep. While in her body, the knife was twisted ninety degrees before being pulled from its path. Tina Marie Cribbs was alive and conscious during the infliction of this fatal wound.
At some point during the attack on Cribbs, she struggled for her life, evidenced by blunt impact injuries to her torso and a laceration to her left wrist indicative of a defensive wound. All this took place in the small confines of a motel bathroom with little if any chance of escape, where Cribbs would have been face to face with her killer and his weapon of choice, a knife with a blade at least nine and one-half inches long.
Cribbs was conscious at the least long enough to realize her lifeblood was flowing down the bathtub drain and that she could not escape death.
We find that competent substantial evidence supports the trial court's finding that the HAC aggravator was applicable in this case and we affirm on this issue.

B. Mitigation
The defense additionally claims that the trial court erred in failing to find that the "capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance." § 921.141(6)(b), Fla.Stat. (1995). In conjunction with this claim, the defense also asserts that the trial court erred in only giving "some weight" to the statutory mitigating circumstance that the "capacity of *995 the defendant to appreciate the criminality of his [or her] conduct or to conform his [or her] conduct to the requirements of law was substantially impaired." § 921.141(6)(f), Fla.Stat. (1995). Furthermore, Rogers argues that the trial court failed to consider and appropriately weigh all of the mitigating evidence presented at trial as required by Campbell v. State, 571 So.2d 415, 419 (Fla.1990).
A mitigating circumstance is broadly defined as "any aspect of a defendant's character or record and any of the circumstances of the offense" that reasonably may serve as a basis for imposing a sentence less than death. Id. at 419 n. 4. When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature. See id. at 419. "As with statutory mitigating circumstances, proposed nonstatutory circumstances should generally be dealt with as categories of related conduct rather than as individual acts." Id. at 419 n. 3; see Reaves v. State, 639 So.2d 1, 5 (Fla.1994) (finding no error where trial court reasonably grouped several nonstatutory mitigating factors into three). After finding mitigating circumstances, the court must expressly consider in its written order each established mitigating circumstance and then must weigh the aggravating circumstances against the mitigating circumstance, in order to facilitate appellate review. See Campbell, 571 So.2d at 420.
The standards of review of a trial court's finding of mitigating circumstances are as follows: (1) whether a particular circumstance is truly mitigating in nature is a question of law and subject to de novo review by this Court; (2) whether a mitigating circumstance has been established by the evidence in a given case is a question of fact and subject to the competent substantial evidence standard; and (3) the weight assigned to a mitigating circumstance is within the trial court's discretion and subject to the abuse of discretion standard. See id. at 419-20; see also James v. State, 695 So.2d 1229, 1237 (Fla. 1997) (finding that so long as the trial court considers all of the evidence, the trial court's subsequent determination of a lack of mitigating evidence will stand "absent a palpable abuse of discretion").
During the penalty phase of the trial, the defense presented testimony from Drs. Robert Berland and Michael Maher, who testified regarding Rogers' mental health. Doctor Berland concluded that Rogers suffered from brain damage, mental illness, and a rare genetic mental disease called porphyria, which impacts the central nervous system and can cause psychosis and strokes. According to Dr. Berland, Rogers had all three symptoms of a psychotic disturbances: hallucinations, delusions, and mood disturbances. Psychological testing indicated that Rogers also suffered from schizophrenia, mania and paranoia. Doctor Berland opined that Rogers' mental illness had a great impact on Rogers' thinking, perception, and behavior.
Similarly, Dr. Maher testified about Rogers' family and medical history, including Rogers' porphyria, alcohol abuse, mental health, and emotional and psychological problems. According to Dr. Maher, porphyria, which is precipitated by alcohol consumption, can cause significant lapses in memory where a person becomes confused, frustrated, and often upset. Doctor Maher also indicated that Rogers had a significant history of trauma to the head. Doctor Maher stated that significant head injuries, porphyria, and alcohol abuse all can contribute to violent behavior. Doctor *996 Maher opined that given Rogers' mental and physical history he had "no serious doubt that [Rogers'] capacity to appreciate the criminality of his conduct with regard specifically to violence toward other people would have been impaired." Finally, Dr. Maher concluded that Rogers' ability to conform his conduct to the requirements of the law would have been substantially impaired.
Although both Drs. Berland and Maher testified at length regarding Rogers' mental health, neither of them stated that Rogers killed Cribbs while he was under the influence of extreme mental or emotional disturbance. In fact, during the discussion regarding the penalty phase jury instructions, the trial judge stated that she heard no testimony on the extreme mental or emotional disturbance mitigator. Thereafter, defense counsel did not object when the judge struck the emotional or mental disturbance mitigator instruction.
Although the trial court did not find that Rogers committed the murder while Rogers was under the influence of extreme mental or emotional disturbance, see § 921.141(6)(b), Fla. Stat., the court did give the standard jury instruction for the mitigating circumstance that Rogers' ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. See § 921.141(6)(f), Fla.Stat. In sentencing the defendant, the trial court made the following findings pertaining to mitigation:
1. The capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
The defense presented testimony of two mental health experts that the Defendant suffers from a psychosis, has suffered brain damage at some point in his life and has a physiological disease called porphyria. The Defendant is a chronic alcohol abuser, and the long-term alcohol abuse coupled with the untreated psychosis, probable brain damage and porphyria which may be exacerbated by alcohol may have substantially impaired the Defendant's capacity to conform his conduct to the requirements of law. The Court gives this statutory mitigating factor some weight.

(Emphasis supplied.)
Additionally, the trial court considered Rogers' character, record or background and circumstances of the offense:
a. The Defendant had a childhood deprived of love, affection or moral guidance. The testimony established that the Defendant's father was an alcoholic who physically abused the Defendant's mother in the presence of the Defendant and his siblings. The evidence further established that the Defendant was introduced to controlled substances at a young age by an older brother and that the same older brother encouraged the Defendant to participate in numerous burglaries as a child. This Court gives this lack of moral upbringing of good family values slight weight.

b. The Defendant has at various times in his adult life been lawfully and gainfully employed or self-employed. A former employer testified that the Defendant was a reliable and well-liked cab driver. The Court gives this mitigating factor slight weight.

c. The Defendant at one time in his adult life was solely responsible for the care of his two children. The Court gives this mitigating factor slight weight.

3. Any other circumstances of the offense.
The Defendant had been drinking alcohol beverages (beer) for some hours on the day he came into contact with the victim and had generously purchased at least one round of drinks for the victim *997 and her friends. There is no indication that this was done with any motive other than generosity. The Court gives this little weight.

(Emphasis supplied.)
In summary, the trial court considered all of the relevant testimony from both the lay and expert witnesses who testified during the penalty proceeding. The court concluded that Rogers' history of mental illness, alcohol and drug abuse, childhood abuse, and poor family upbringing, among other evidence, supported the finding of one statutory and several nonstatutory mitigating circumstances. The trial court did not characterize Rogers' mitigating evidence in "broad generalizations" as the trial court erroneously did in Crump v. State, 654 So.2d 545, 547 (Fla.1995), a case relied upon by Rogers. Rather, the trial judge made specific findings with regards to mitigation, identifying each mitigating circumstance presented by the defense. In addition to finding and weighing mitigating evidence, as required by Campbell, the trial judge dealt with the nonstatutory mitigators "as categories of related conduct rather than as individual acts." Campbell, 571 So.2d at 419 n. 3. As stated in Campbell, the weight given to each mitigating factor rests within the discretion of the trial court. See id. at 420. Although the trial judge did not give significant weight to the mitigating evidence, the sentencing order clearly reflects that the trial court considered the evidence and weighed it accordingly. In light of these findings, we cannot conclude that the trial court abused its discretion in the weight given to the mitigating evidence. We find that the trial court properly abided by the procedures discussed in Campbell. See id. at 419-20.

C. PET-Scan Testing
We next turn to Rogers' contention that the trial court erred by denying his motion to have a PET-Scan performed on Rogers' brain. A PET-Scan is a diagnostic test that may assist in determining whether a person's brain is functioning properly.[5] Prior to trial, the defense filed a Motion for Testing at Public Expense seeking a PET-Scan of Rogers' brain. In support of the motion for PET-Scan, Dr. Berland, Ph.D., a forensic psychologist, provided an affidavit to the trial court in which he stated:
A PET scan would appear to be a valuable element of a comprehensive evaluation of this defendant's brain and mental functioning, and an important tool in presenting the picture of his impairment to the jury. Particularly in a case where a victim has died and the jury must consider whether an accused defendant should live or die, the stakes are high and the evidence to be presented to the jury must be of the highest quality. It is my opinion that a PET scan would serve a valuable corroborating and explanatory function in presenting an account of this defendant's behavior to the jury. The PET scan measures the different levels of brain activity (i.e. levels of metabolic activity) in different brain locations in a series of slices through the brain comparable to those obtained in *998 CT scan. Many forms of injury to the brain tissue both traumatic and otherwise, do not affect the structural integrity of the brain tissue. Rather, the shape of the brain tissue remains unchanged, but the ability to function properly is altered by the injury. The anticipated results of a PET scan would provide visual corroboration of the physiological, medical underpinnings of this defendant's impairment and related emotional problems for an understandably skeptical lay jury. This test would also avoid having the defense ask the jury in a case of this magnitude to rely solely on a form of testing which indicates brain injury (i.e. the Wechsler Adult Intelligence Scale) which depends on voluntary responses by the defendant and whose outcome could be argued (incorrectly) to be subject to manipulation by the defendant. No argument could be made that the defendant manipulated the outcome of this medical examination. Although the Wechsler is associated with over four decades of research verifying its utility as a measure of impairment from brain injury, a medical test to supplement and elaborate on the Wechsler results would add a significant impetus to a jury presentation. Given the nature of this defendant's history of incidents involving potential brain injury, and the test results suggesting impairment from brain injury, it is reasonably anticipated that the results of the PET scan would be significant and useful.

(Emphasis supplied.)
Doctor Maher, a forensic psychiatrist, also submitted a letter to the court, which stated only: "Upon consideration of my preliminary evaluation of Glen Rogers it is evident that a PET-Scan of the brain will be necessary to complete this evaluation." Thereafter, the trial court denied the motion, stating:
I'm fully aware of the security risks [of transporting Rogers to Jacksonville] and the concerns regarding the costs [of the PET-Scan]. My concern is that if there is a potential mitigator here in this case that the Defense should certainly be given the opportunity to show that it exists, and I think that the Defense can do that through the expert testimony that they have available to them already.
In a subsequent proceeding, the defense moved to have Rogers undergo a magnetic resonance imaging ("MRI") test. Despite the State's concerns that Rogers was a security risk, the trial court granted the motion but limited costs to $1500. After the results of the MRI, which found no evidence of brain damage, the defense renewed its motion for a PET-Scan. The defense argued that the negative MRI test results further necessitated a PET-Scan because the jury likely would have been misled by the normal MRI results as to the extent of Rogers' brain damage.
During the second motion hearing, Dr. Berland indicated that Rogers' medical records from Mercy Hospital revealed that during his 1991 hospitalization for a skull fracture, Rogers was on Dilantin, an anti-seizure medication. According to Dr. Berland, a PET-Scan was the only way to verify Rogers' diagnosed seizure disorder, which Dr. Berland believed to be a mitigating circumstance. However, in denying the motion, the trial court stated: "Seizure disorder can be shown if you think that's a nonstatutory mitigator. That might be necessary at some point. It can be shown through the previous hospital records. Apparently somebody diagnosed him. So it's denied."
A trial court's decision to deny a defendant's motion for a PET-Scan will not be disturbed absent an abuse of discretion. Cf. San Martin v. State, 705 So.2d 1337, 1347 (Fla.1997) (finding that a trial court's refusal to provide funds for the appointment of experts for an indigent defendant *999 will not be disturbed absent an abuse of discretion); see also Robinson v. State, 761 So.2d 269, 275-76 (Fla.1999), cert. denied, 529 U.S. 1057, 120 S.Ct. 1563, 146 L.Ed.2d 466 (2000); Hoskins v. State, 702 So.2d 202, 209 (Fla.1997). In evaluating whether the trial court abused its discretion, this Court generally looks at two factors. See San Martin, 705 So.2d at 1347. First, before the trial court will provide a defendant with the necessary funds for a PET-Scan, the defendant must establish a particularized need for the test, that is, that the test is necessary for experts to make a more definitive determination as to whether the defendant's brain is functioning properly and to provide their opinions about the extent of the defendant's brain damage. Cf. San Martin, 705 So.2d at 1347; see also Robinson, 761 So.2d at 275; Hoskins, 702 So.2d at 209. Second, this Court must consider whether the defendant was prejudiced by the trial court's denial of the motion requesting a PET-Scan. Cf. San Martin, 705 So.2d at 1347; see also Robinson, 761 So.2d at 275-76; Hoskins, 702 So.2d at 210.
Although Hoskins did not establish a bright-line rule for determining whether a PET-Scan is warranted in a given case, we emphasize that a particularized showing of necessity is the polestar for whether any diagnostic test should be authorized by the trial court. In Robinson, this Court found that the trial court did not abuse its discretion in denying the defendant a Single Photon Emission Computed Tomography ("SPECT") scan because "neither doctor testified that the SPECT scan test was necessary to complete their medical opinion; they merely stated that the exam would have been helpful." 761 So.2d at 275-76. In Robinson, both medical experts testified that the defendant suffered from apparent brain damage in the left temporal lobe. The Court noted that one of the doctors "requested the exam merely to confirm his conclusions. However, the defense did not mention what those conclusions were." Id. at 276 n. 7. In finding that the trial court did not err in denying the defendant's motion for a SPECT scan, the Court concluded that the results of the SPECT scan would only have "confirmed the doctors' already established opinions, which were substantially accepted by the trial court." Id. at 276. In contrast to Robinson, the expert in Hoskins not only recommended that the PET-Scan be performed, but also provided the trial court with specific reasons as to why the PET Scan was necessary in that case. See Hoskins, 702 So.2d at 208-09.
In this case, we conclude that the trial court did not abuse its discretion in denying Rogers' request for the PET-Scan. Although Dr. Berland stated that the PET-Scan would have value as corroboration, he did not testify that the PET-Scan was necessary to complete his medical opinion regarding Rogers' brain damage. Doctor Maher submitted a letter informing the trial court that the PET-Scan was necessary; however, the letter stated in full that "[u]pon consideration of my preliminary evaluation of Glen Rogers it is evident that a Pet scan of the brain will be necessary to complete this evaluation." In contrast to the expert in Hoskins, Dr. Maher's conclusory letter failed to establish a particularized showing of need for the PET-Scan. See Hoskins, 702 So.2d at 208-09; Robinson, 761 So.2d at 275-76.
Even if we found that the PET-Scan should have been authorized, we would not find that the second prong of prejudice has been established. See San Martin 705 So.2d at 1337. Both Drs. Maher and Berland testified about Rogers' brain damage and overall mental health, including Rogers' brain injuries, psychotic disturbances, porphyria, and the fact that Rogers previously had been prescribed the anti-seizure medication Dilantin. Significantly, the defense *1000 also introduced Rogers' Mercy Hospital medical records that referred to the diagnosis of Rogers' intracranial hemorrhage in 1991 and contained evidence of Rogers' seizure disorder.
Furthermore, in contrast to Hoskins, the trial court in the instant case found a statutory mitigating circumstance pertaining to Rogers' mental condition. The trial court also considered the defendant's deprived childhood and alcohol and drug abuse, among other things, in finding nonstatutory mitigation. Therefore, because the defense was able to provide substantial evidence of Rogers' mental health by means other than a PET-Scan, including his prior brain injuries, psychological disturbances, and seizure disorder, and because the trial court found mitigating circumstances related to his mental condition, including a statutory mitigating circumstance, we do not find that Rogers was prejudiced by the denial of the PET-Scan.

D. Misdemeanor Testimony
In his next claim of error, Rogers asserts that the trial court erred in failing to grant his motion for a mistrial after the jury heard testimony from two State witnesses during the penalty phase regarding Rogers' prior aggravated assault conviction from California. Section 921.141(5)(b), Florida Statutes (1995), provides the State with a mechanism to establish an aggravating circumstance where a defendant "was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person." In an effort to establish this aggravating circumstance, the State introduced testimony from Raymundo Hernandez and Kevin Becker, who provided jurors with detailed events from an incident in California in which Rogers had brandished an eight- or nine-inch knife and assaulted two individuals.
Prior to the penalty phase, defense counsel argued that this testimony concerning the prior incident was inadmissible. According to the defense, Rogers pled to both counts of aggravated assault and was sentenced to 180 days in the county jail and three years probation. The defense claimed that Rogers' certified copy of the California judgment for aggravated assault indicated that both counts were misdemeanors rather than felonies.
In response, the prosecution argued that the California Penal Code indicated that Rogers' prior crime could be either a felony or misdemeanor, depending on Rogers' plea arrangement. Further, regardless of whether Rogers' convictions from California were misdemeanors, the prosecution argued that the trial court should consider Rogers' prior conviction to be a felony conviction in Florida because the elements of the California offense were identical to Florida's felony aggravated assault statute. Ultimately, the trial court allowed jurors to hear the testimony of both Hernandez and Becker, but instructed the jury to look at the circumstances of the prior offense to determine if the offense was a violent felony.
At the conclusion of Becker's testimony, the trial court questioned Becker, outside of the jury's presence, about Rogers' prior California offense. Becker identified the document as a California judgment and sentence and said that the case appeared to have been turned over to the Municipal Court and was handled by the city attorney. He believed the Municipal Court's jurisdiction encompassed only misdemeanors, while the Superior Court handled felonies. Based on this testimony, defense counsel moved for a mistrial on the basis that Rogers' prior conviction was only a misdemeanor and that the jury had been "contaminated by evidence of violent acts." The trial court concluded that Rogers' prior California conviction was only a misdemeanor. Although the trial court denied *1001 the mistrial, the trial court instructed the jury to disregard the testimony of both Becker and Hernandez and to afford their testimony no weight in the jury's penalty phase deliberations.
Finally, at the conclusion of the trial, the defense moved for a new penalty phase hearing, arguing once again that Rogers was prejudiced by the improper misdemeanor testimony. The trial court denied the motion, stating:
I'm going to deny the motion for a new penalty phase, although the evidence relating to the aggravating circumstance which was not an aggravating circumstance certainly did come in. The jury heard it. And the jury was instructed to disregard that evidence. They were not instructed that they could consider that evidence as an aggravating circumstance.
. . . .
In this case since the Court has not yet gone through the weighing process, I'm going to assume that the jury acted properly in applying the instructions given to them. And the Court can certainly disregard the evidence of a, what amounted to a misdemeanor in California. So I'll deny the motion.
This Court must determine whether the trial court abused its discretion in its denial of a mistrial. See Goodwin v. State, 751 So.2d 537, 546 (Fla.1999). The determination of whether substantial justice warrants granting a mistrial is within the discretion of the trial judge. See Sireci v. State, 587 So.2d 450, 452 (Fla.1991). In analyzing the abuse of discretion issue in this case, it is necessary to determine whether the admission of the testimony of Hernandez and Becker, which the trial court recognized was error, was so prejudicial as to deny Rogers a fair trial. See Cole v. State, 701 So.2d 845, 853 (Fla.1997).
The State does not argue on appeal that the misdemeanor conviction should have been admitted. Rather, the State makes the following somewhat unusual argument:
Any error in admitting such testimony must be deemed harmless. During the preparation of this brief, Rogers was tried and convicted of first degree murder and sentenced to death in California. Thus, even if this Court reverses the case based on the improper testimony of Hernandez and Becker, during resentencing the State would introduce evidence of the California murder conviction. The State would then have its third statutory aggravator. Therefore, a remand in this case would merely constitute legal churning.
We cannot speculate as to what evidence would be admitted in a subsequent penalty-phase hearing. Instead, we must determine whether the erroneous admission of the misdemeanor conviction prejudiced Rogers to such an extent that he could not receive a fair trial.
We conclude that the trial court did not abuse its discretion in denying the motion for mistrial. First, the trial judge specifically instructed the jury to disregard the testimony of the two State witnesses. Second, the prosecution did not refer to the witnesses' testimony during closing argument and the court did not instruct the jury on any aggravating circumstances other than the pecuniary gain and HAC aggravators. Third, even without the testimony of Hernandez and Becker, there was other substantial evidence in aggravation presented to the jury. Fourth, prior to conducting its independent weighing of the aggravating and mitigating circumstances, the trial court stated that it would disregard that testimony in determining Rogers' sentence. As in Owen v. State, 596 So.2d 985, 989 (Fla.1992), we find that "[g]iven the nature and extent of other *1002 evidence in aggravation presented to the jury we conclude that its recommendation would have been unchanged."

E. Closing Argument Errors
In the next point, Rogers argues that the trial court committed reversible error by failing to grant a mistrial based on allegedly improper prosecutorial comments during the State's penalty phase closing argument. This Court has repeatedly held that allegedly improper prosecutorial remarks cannot be raised on appeal unless a contemporaneous objection is lodged. See McDonald v. State, 743 So.2d 501, 505 (Fla.1999); Kilgore v. State, 688 So.2d 895, 898 (Fla.1996); Gibson v. State, 351 So.2d 948, 950 (Fla.1977). The exception to this procedural bar is where the prosecutor's erroneous comments constitute fundamental error, which has been defined as the type of error that "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Urbin v. State, 714 So.2d 411, 418 n. 8 (Fla.1998) (quoting Kilgore, 688 So.2d at 898).
Because Rogers never objected during the State's penalty phase closing argument, we must consider whether the comments, taken individually and collectively, rise to the level of fundamental error. See McDonald, 743 So.2d at 505. We find that most of the arguments complained of do not constitute error, much less fundamental error.
Virtually the same argument that we condemned in Ruiz v. State, 743 So.2d 1, 5 (Fla.1999), regarding "Operation Desert Storm," was repeated by the prosecutor.[6] However, our decision in Ruiz was issued subsequent to the closing argument in this case and defense counsel did not lodge a contemporaneous objection. We do not find this single unobjected-to argument to constitute fundamental error, see Kilgore, 688 So.2d at 898, nor does it warrant a mistrial. See Cole, 701 So.2d at 853.

F. Proportionality
Rogers next claims that the death penalty is disproportionate in this case. "The death penalty is reserved for `the most aggravated and unmitigated of most serious crimes.'" Clark v. State, 609 So.2d 513, 516 (Fla.1992) (quoting State v. Dixon, 283 So.2d 1, 7 (Fla.1973)). This Court performs proportionality review to prevent the imposition of "unusual" punishments contrary to article I, section 17 of the Florida Constitution. See Tillman v. State, 591 So.2d 167, 169 (Fla.1991). In deciding whether death is a proportionate penalty, the Court must consider the totality of the circumstances of the case and compare the case with other capital cases. See Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998). It is not a comparison between the number of aggravating and mitigating circumstances. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). Therefore, this Court must determine whether the imposition of the death penalty in this case is proportionate when compared to similar crimes.
This case is similar to Merck, which also involved evidence that the defendant had deliberately twisted the knife blade during the stabbing of the victim. 664 So.2d at 942-43. In Merck, the trial court found two aggravating circumstances: HAC and prior violent felony. See id. at 941. The court found no statutory mitigating circumstances but found two nonstatutory mitigating circumstances: the defendant had an abused childhood and had been drinking on the night of the murder. See id. Based on the circumstances *1003 of the stabbing, this Court held that the death penalty was proportionate. See id. at 943; see also Pope v. State, 679 So.2d 710, 716 (Fla.1996) (upholding death penalty where there was competent substantial evidence to support the premeditated murder for pecuniary gain despite two statutory mitigatorsextreme mental or emotional disturbance and impaired capacityand three nonstatutory mitigatorsintoxication, violence occurring after a disagreement between boyfriend and girlfriend, and mental or emotional disturbance); Orme v. State, 677 So.2d 258, 263 (Fla.1996) (finding death penalty proportional where defendant beat and strangled victim in a motel room, trial court found three statutory aggravatorsHAC, pecuniary gain, and sexual batteryand two statutory mental mitigatorssubstantial impairment and extreme emotional disturbance); Geralds v. State, 674 So.2d 96, 105 (Fla.1996) (affirming death sentence where murder was especially heinous, atrocious, or cruel and committed during the commission of a robbery and both statutory and nonstatutory mitigation was afforded little weight); Breedlove v. State, 413 So.2d 1, 9-10 (Fla.1982) (affirming death sentence where victim suffered single stab wound while asleep in bed, death was heinous, atrocious, or cruel, the murder was committed during the course of a burglary, and defendant had prior conviction of violent felony and little mitigation). We find that the circumstances in this case establish that Rogers' death sentence is proportional to other cases in which sentences of death have been upheld.

NEWLY DISCOVERED EVIDENCE
We finally address the denial of Rogers' motion for new trial based on newly discovered evidence. After the jury verdict of guilt, Rogers made a motion claiming that there was newly discovered evidence establishing his innocence. Thomas Ambrose, a homeless person who came forward during the penalty phase of the trial, claimed that he was with Rogers on the evening of November 5, 1995. According to Ambrose, while waiting for Rogers in the parking lot of the motel, he observed a female and a Mexican male enter Rogers' motel room. Ambrose claims that he and Rogers then spent several hours drinking at another motel, following which he accompanied Rogers back to the motel room where Rogers discovered that the victim was dead. Ambrose claimed that when Rogers asked what he should do, he told Rogers to just get in the car and leave.
The trial court conducted an evidentiary hearing and found that Ambrose's testimony qualified as newly discovered evidence. However, the trial court denied Rogers' motion for a new trial, concluding that Ambrose's testimony would not have produced an acquittal on retrial. On appeal, Rogers claims that newly discovered evidence entitles him to a new trial and that the trial court erred in denying him relief. We disagree.
In order to provide relief on the ground of newly discovered evidence, the asserted facts must have been: (1) unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known them by the use of diligence; and (2) the newly discovered evidence must be of such a nature that it would probably produce an acquittal on retrial. See Melendez v. State, 718 So.2d 746, 747 (Fla.1998); Blanco v. State, 702 So.2d 1250, 1251 (Fla.1997); Jones v. State, 591 So.2d 911, 915 (Fla.1991). In reviewing the trial court's application of the newly discovered evidence rule, this Court applies the following standard of review:
As long as the trial court's finding are supported by competent substantial evidence, "this Court will not substitute its *1004 own judgment for that of the trial court on question of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court."
Melendez, 718 So.2d at 747-48 (quoting Blanco, 702 So.2d at 1251).
In this case, the trial court found, among other things, that: (1) Ambrose is an alcohol and drug user who admitted to drinking on the night in question; (2) Ambrose provided authorities with no information surrounding the murder that could not have been gained from reading the newspaper or watching television news reports; and (3) Ambrose's testimony was inconsistent, incredible, unbelievable, and did not agree with the physical evidence in the case. The record in this case thus shows that the trial court properly applied the law, and the trial court's findings are supported by competent substantial evidence. Consequently, this Court is precluded from substituting its own judgment for that of the trial court on this matter. See Blanco, 702 So.2d at 1252. We find no error.

CONCLUSION
Based on the foregoing, the convictions and the death sentence are hereby affirmed.
It is so ordered.
SHAW, HARDING and LEWIS, JJ., concur.
WELLS, C.J., concurs with an opinion.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which PARIENTE, J., concurs.
QUINCE, J., concurs in part and dissents in part with an opinion, in which PARIENTE, J., concurs.
WELLS, C.J., concurring
I concur in the majority opinion. I write only to state my view that the PET scan is a radio-neurological examination which requires a reading by a medical specialista radiologist. There is simply no medical opinion in the record upon which to conclude that such a scan would have provided any relevant or material information which was not already in the record.
I specifically do not agree with the statement in the concurring opinion that, "[l]ike a PET scan, an MRI is a recognized medical procedure that is regarded as objective in that it does not rely on subjective reports by a patient." This statement leaves the impression that there is a medical opinion in the record explaining what a PET scan is and what it does. This is not correct. The only testimony or documentation in the record in respect to a PET scan are by psychologists, who are not medical doctors and who are not qualified to read any type of radiological examination. In fact, what the use of a PET scan is about is an attempt by a psychologist, Dr. Woods, to use what the psychologist believes would be reflected by a PET scan as a basis for his subjectivenot objective psychological opinions. To provide a record upon which it could be concluded that the trial court abused its discretion in respect to the PET scan, I conclude that there must have been a radiologist's opinion that a PET scan was necessary. Further, the psychological opinions formed on the basis of what a PET scan indicated would have to meet the Frye test. See Frye v. United States, 293 F. 1013 (D.C.Cir.1923). None of this is contained in the present record.
In view of the MRI and other medial evidence in this record, the trial court's decision should be affirmed, as we did in respect to the request for a similar test by this same psychologist in Robinson v. State, 761 So.2d 269 (Fla.1999).
*1005 ANSTEAD, J., concurring in part and dissenting in part.
While I agree with much of the majority opinion and its affirmance of appellant's convictions, I cannot agree with its conclusion that the trial court did not abuse its discretion in denying appellant's request for a PET scan or that the other critical trial errors identified by the majority do not require a new penalty proceeding. In addition to the clear and prejudicial error in the denial of a PET scan, other serious errors requiring a new penalty phase include: (1) the trial court's denial of a motion for mistrial after the erroneous admission of testimony concerning the defendant's prior use of a large knife in an assault in California; and (2) the prosecutor's improper use of a highly personal and prejudicial "Desert Storm" argument during her closing argument seeking the death penalty.

PET SCAN
The record reflects without contradiction that the appellant demonstrated the need for a PET scan to evaluate the condition of his brain and the mental mitigation related to that condition. Under our holding in Hoskins v. State, 702 So.2d 202 (Fla.1997), it was error for the trial court to refuse that request. In Hoskins, we found under identical circumstances that the trial court had erred in not granting the defendant's request for a PET scan. See id. at 209. In Hoskins, as here, the defense demonstrated through expert testimony that the PET scan was necessary to the expert's proper evaluation of the defendant. If anything, the evidence of the need for the PET scan was more plentiful and much stronger here than in Hoskins. In Hoskins we reversed and remanded the case because "[w]e [could] not say, without benefit of the requested [PET scan] testing, that this error had no effect on the outcome of this proceeding." Id. at 210. We explained that we had to remand the case to the trial court to order a PET scan and determine whether the results of that test showed an abnormality and if so whether the results altered the expert's trial testimony. Id.
The majority has failed to explain why the result should be any different here. Like Hoskins, the trial court here denied the PET scan under circumstances that cannot be meaningfully distinguished. In fact, here, not only did the mental health experts establish the necessity of the PET scan, the defendant Rogers was left with the negative results of the other diagnostic imaging tests done, and those negative results were used affirmatively against the defendant by the State as conclusive evidence of no brain damage despite the unrebutted testimony of the experts that appellant suffered from brain damage.
The majority overlooks the fact that the brain-damage evidence that was presented by the experts in the form of opinion testimony was sharply challenged and its effect diminished greatly by the State during its cross-examination of Dr. Maher, wherein the doctor admitted that an MRI test had been performed on the defendant which reflected no evidence of brain damage. Like a PET scan, an MRI is a recognized medical procedure that is regarded as objective in that it does not rely on subjective reports by a patient. Juries are likely to be familiar with MRIs as a scientific tool used in examining the brain, and place great value on them for the very reason that such testing does not rely on information provided by the patient. In contrast, the average person would not be as familiar or trusting with the complex battery of diagnostic, psychological tests performed on the defendant here to determine brain functioning abilities (i.e., the Minnesota Multiphasic Personality Inventory (MMPI) and the Wechsler Adult Intelligence Scale (WAIS)). These tests rely on responses by the patient, here the defendant. Even *1006 if jurors are familiar with such tests, they would likely not place as much credibility on such test results compared to the hard data discerned from an MRI or PET scan.
Finally, and critically, although the trial judge found one statutory mitigator and several nonstatutory mitigators, the record tells us nothing about what the jury found, except for a recommendation of death. A scenario we cannot rule out is that the jury may have agreed with the State and gave absolutely no consideration to the extensive defense evidence of brain damage.[7] We should honor the precedent of Hoskins and find error in the denial of the PET scan.

PRIOR VIOLENT KNIFE ATTACK
In addition, of course, the jury that recommended death for Rogers was allowed to hear improper evidence of the most damaging kind against him that was later determined to have been erroneously admitted. During the penalty phase of the trial, the only evidence presented by the State consisted of the testimony of Raymundo Hernandez who testified in great detail about an unrelated assault upon him by Rogers at knife-point.
Hernandez testified that as he attempted to exit the elevator in his apartment complex, he saw Rogers kick the door of the apartment next to his and heard him yell, "Open the door, motherfucker bitch." According to Hernandez, Rogers shared that apartment with a woman named Maria who was Rogers' girlfriend. Rogers then turned to the elevator and refused to allow Hernandez to exit it. Rogers pushed Hernandez into the elevator and pointed a "seven or eight-inch kitchen knife" at his neck. Rogers then repeatedly told Hernandez not to move or he would kill him. While holding the knife against Hernandez' throat, Rogers then pushed the buttons in the elevator making it ride up and down. After several minutes, the elevator opened into the lobby and Rogers pushed Hernandez out of the elevator and then proceeded to chase and assault a security guard. The investigating police officer testified that his investigation reflected that Rogers exited the elevator and attacked the security guard. He first threw a stack of newspapers at the guard and then reached over the desk, grabbed the guard by his lapels and attempted to pull him over the counter. When the attempt to pull the guard over the counter failed, Rogers pushed the guard to the ground. He then picked the guard up and started banging the guard's head against a cement pillar. Based upon these events, Rogers was convicted of two counts of misdemeanor assault.
Because the trial court subsequently found all of this evidence to be irrelevant to any of the issues in the penalty phase of the trial, the trial court directed the jury to ignore it. However, it is apparent that this evidence effectively amounted to improper collateral crimes evidence which, under our case law, is presumed harmful, see Castro v. State, 547 So.2d 111, 115 (Fla.1989); Williams v. State, 692 So.2d 1014, 1015 (Fla. 4th DCA 1997), and would most certainly have tainted the jury's recommendation, despite the trial court's instruction to disregard it. See Lawrence v. State, 614 So.2d 1092 (Fla.1993). The initial and erroneous admission of such devastating evidence presents a classic case of not being able to "unring the bell." The jury heard this bell ring loud and clear and it would be completely unrealistic to expect them to simply ignore it.
We have previously concluded that such an error "is presumed to infect the entire *1007 [penalty phase] proceeding with unfair prejudice." Castro, 547 So.2d at 115. In Castro, the State introduced evidence during the guilt phase of the trial that several days before the murder for which Castro was being tried, he had tied up another person and threatened to stab him. This Court held that this evidence constituted improper collateral crimes evidence and had been erroneously admitted during the guilt phase of the trial. However, while we found this evidence harmless as to the conviction, we concluded that it could not be considered harmless as to the recommendation of death. See 547 So.2d at 115. We reasoned:
Substantially different issues arise during the penalty phase of a capital trial that require analysis qualitatively different than that applicable to the guilt phase. What is harmless as to one is not necessarily harmless as to the other, particularly in light of the fact that a Williams rule error is presumed to infect the entire proceeding with unfair prejudice.

While the guilt phase asks the jury to determine whether the defendant committed the crime charged, the penalty phase asks the jury to recommend whether that defendant should be put to death or spend life in prison. This recommendation must be based upon a weighing of aggravating and mitigating factors that may properly be inferred from any of the evidence, including that which has been introduced during the guilt phase. In the present case, for instance, the state did not present a separate case during the penalty phase. The prosecutor stated:
Your Honor, at this time the State would proffer all of the evidence, both testimonial and by way of exhibits, that was admitted in the first phase, in support of the State's position on the aggravating circumstances in the second phase.
Once the jury has received penalty phase evidence and made a life recommendation, for the trial court to then reject that recommendation and impose a sentence of death, "the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Tedder v. State, 322 So.2d 908, 910 (Fla. 1975). Under those circumstances, unless the state can prove that "there is no reasonable possibility that the error [complained of] contributed to the conviction," DiGuilio, 491 So.2d at 1138 (citation omitted), the error cannot be deemed harmless. This is especially true where the error is presumptively harmful, such as a Williams rule violation. Peek, 488 So.2d at 56; Straight, 397 So.2d at 908.
Based on the record before us, we cannot say that the state has proven beyond a reasonable doubt that the improper testimony could not have affected the penalty phase determination. The jury heard that Scott and Castro had been drinking during the morning prior to the murder. The jury heard from Dr. Mara, who diagnosed Castro as having an alcohol- and drug-addicted personality. Dr. Mara also testified that Castro had been victimized by a history of child abuse, especially incest, which began at the age of four and which might account for his bizarre thinking and aggressive behavior. The case for mitigationthat Castro was an alcoholic, addict, and victim is very different from the image presented by McKnight's irrelevant and improper testimonythat Castro had an inherent criminal propensity and bad character. In sum, the Williams rule error improperly tended to negate the case for mitigation presented by Castro and thus may have influenced the jury in its penalty-phase deliberations. For this reason, we cannot say beyond any *1008 reasonable doubt that had the jury not heard McKnight's irrelevant, prejudicial testimony, it might not have determined that a life sentence was appropriate under the circumstances.
547 So.2d at 115-16. Castro is directly on point. Surely the majority here has not demonstrated in its opinion that there is no reasonable possibility that the error complained of contributed to the sentence of death. Indeed, this Court has consistently found such errors patently harmful.
In Lawrence, for example, the State had introduced evidence of collateral crimes during the guilt phase of the trial, some of which the trial court later instructed the jury to disregard. See 614 So.2d at 1095. Relying on Castro, we found the evidence harmless as to conviction, but not harmless as to the death sentence. See id. at 1097 ("On this record we cannot say that the state has shown beyond a reasonable doubt that the similar fact evidence of other crimes did not affect the penalty phase."). Accordingly, we vacated Lawrence's sentence of death and remanded the case for a new penalty phase proceeding. See id.
Here, the testimony concerning the California crimes was the only evidence of aggravation presented by the State during the penalty phase of the trial. This makes the instant case far worse than Castro and Lawrence since the improperly admitted evidence was presented during the penalty phase for the sole purpose of aggravating the penalty. Although the jury was later told to disregard the testimony about the California incident, the damage was already done, the "bell already rung." In other words, despite the judge's admonishment, this evidence could have easily tainted the jury's recommendation by negating the mitigating evidence presented by the defense and by painting the defendant in a completely different picture than that presented by the mitigation. See Castro. For example, the defense had attempted to show that Rogers' conduct was the result of a deprived childhood, during which his father beat his mother, and that he suffered from brain damage which was exacerbated by alcohol and drugs. The evidence of the California assaults, however, depicts Rogers as a man capable of sudden violent outbursts with a knife and without justification. It would be naive to think that the jury would be able to completely disregard the evidence of Rogers' prior violent acts in California. See Lawrence. Indeed, the jury now had heard concrete evidence that Rogers was the very bad man the State claimed.[8]
*1009 Moreover, the California incidents are especially prejudicial in this case because there were no witnesses to Cribbs's murder. She was simply found dead with two puncture wounds. Based on the lack of evidence as to what happened in the motel room, it would not be difficult for the jury to imagine Rogers exhibiting the same type of rage on Cribbs as he did on Hernandez and the security guard. Cf. Castro; Williams, 692 So.2d at 1015. Because of the damaging nature of this testimony, combined with the lack of evidence as to what actually occurred during Cribbs's murder, it is apparent that a mistrial should have been granted and a new penalty phase conducted without the taint of this improper evidence.

DESERT STORM ARGUMENT
At the outset, I agree with the majority that the prosecutor's single, unobjected-to Desert Storm argument, while error, would ordinarily not amount to fundamental error. However, this case presents a unique situation where we have already expressly found this same argument to be a flagrant error in another capital case. Further, when this improper argument is considered along with the fact that the defense was denied the benefit of a PET scan, and the jury heard improper but inflammatory evidence of other crimes Rogers committed, the error further demonstrates why these other substantial errors could not possibly be harmless. Indeed, it is impossible for this Court to conclude that the jury's decision to recommend death was not affected by these three serious errors. Hence, under our harmless error analysis in State v. DiGuilio, 491 So.2d 1129 (Fla.1986), we are duty-bound to reverse and remand for a new penalty-phase proceeding.
PARIENTE, J., concurs.
QUINCE, J., concurring in part and dissenting in part.
While I agree with the majority's affirmance of Roger's convictions for first-degree murder, armed robbery and grand theft of a motor vehicle, I believe that reversible error occurred in the penalty phase when the trial court denied Roger's request for a PET scan. Since the trial court should have ordered this scientific *1010 test but did not, Rogers should have a new penalty phase proceeding.
In our prior opinions concerning PET scans, we indicated that a trial court's denial of a defendant's motion for a PET scan will not be disturbed on appeal absent an abuse of discretion. In determining whether, in a particular case, there has been an abuse of discretion, the reviewing court should consider whether the defendant has shown a necessity for the test and whether the defendant has been prejudiced by the trial court's failure to provide the test. See Hoskins v. State, 702 So.2d 202 (Fla.1997). Under the facts of this case, both prongs have been established.
The defense presented information from two medical experts concerning the need for the PET scan. While neither expert used the magic word "necessary" or "necessity," their description of the use to be made of the examination proves its necessity. Moreover, because there was no PET scan done, the State was able to argue in closing that there was an absence of objective evidence of brain damage. Because the doctors indicated the PET scan was "necessary" to show and explain the defendant's brain damage to the jury, the trial court abused its discretion in denying the request for this scientific testing.
Therefore, I would remand this case to the trial court for a new sentencing hearing after performance of the PET scan.
PARIENTE, J., concurs.
NOTES
[1] The State and the defense stipulated that "Glen Rogers is the person who wrote the `do not disturb' sign" and further agreed that Rogers was the person who filled out the motel registration card that was presented into evidence by the State.
[2] Rogers' claims are: (1) the trial court erred in failing to grant a judgment of acquittal on the first-degree murder charge because the State failed to present sufficient evidence to support either premeditated or felony murder; (2) the evidence does not support the pecuniary gain or HAC aggravators; (3) the trial court erred by failing to find applicable the mitigating circumstance that the "capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance," § 921.141, Fla.Stat. (1995), and to give both statutory mental mitigating circumstances great or significant weight; (4) the trial court erred by failing to consider and appropriately weigh all mitigating circumstances in accordance with Campbell v. State, 571 So.2d 415 (Fla.1990); (5) the trial court erred in denying the defense's motion to have a Positron Emission Tomography Scan ("PET-Scan") performed on Rogers prior to trial; (6) the trial court committed reversible error by failing to grant Rogers' motion for a mistrial after witnesses testified during the penalty phase regarding Rogers' prior criminal misdemeanor conviction in California; (7) the trial court committed reversible error by failing to declare a mistrial based on improper prosecutorial argument during the penalty phase closing argument; (8) the trial court erred by denying the defense's motion to disqualify the Hillsborough County State Attorney's Office; (9) the trial court erred by denying a defense motion for a new trial based on newly discovered evidence; and (10) the imposition of the death penalty is disproportionate in this case.
[3] A general verdict form was used in this case. Thus, in order to affirm Rogers' first-degree murder conviction, the evidence must support either premeditated or felony murder. See Jones v. State, 748 So.2d 1012, 1024 (Fla. 1999) (citing Mungin v. State, 689 So.2d 1026, 1029-30 (Fla.1995)).
[4] In Jones, 652 So.2d at 349-50, the Court applied the 1989 version of the State's robbery statute. Since that decision, the Legislature has not changed or amended the robbery statute.
[5] The State argues that it would be inappropriate for this Court to find that the trial court abused its discretion in denying Rogers' request for a PET-Scan because, according to the State, there is authority suggesting that PET-Scan evidence fails to satisfy the requirements set forth in Frye v. United States, 293 F. 1013 (D.C.Cir.1923), for determining the admissibility of scientific evidence. The scientific reliability of PET-Scan evidence was never at issue in the trial court. Moreover, contrary to the State's assertions, the United States Court of Appeals for the Eighth Circuit has determined that "[t]here is also no question that the PET scan is scientifically reliable for measuring brain function." Hose v. Chicago Northwestern Transp. Co., 70 F.3d 968, 973 (8th Cir.1995).
[6] Assistant State Attorney Karen Cox was the lead prosecutor in this case and the prosecutor who presented the improper "Operation Desert Storm" closing argument in Ruiz v. State, 743 So.2d 1, 5 (Fla.1999).
[7] Of course, the mitigation that was presented was further negated by the erroneous admission of evidence of Rogers' violent acts in California. See infra, pp. 1006-09. This only enhances the harm caused by the denial of the PET scan.
[8] The cases cited by the majority are easily distinguishable. This case does not involve an inadvertent, off-handed remark, as in Cole v. State, 701 So.2d 845 (Fla.1997), and Sireci v. State, 587 So.2d 450 (Fla.1991), two of the cases relied upon by the majority. Owen v. State, 596 So.2d 985 (Fla.1992), is slightly closer, but it too is distinguishable. During the penalty phase of a murder charge of a Boca Raton woman, the State had introduced evidence of the defendant's unrelated criminal charges, one of which involved a murder. The trial court used these convictions to support the prior violent felony aggravator. However, those convictions were subsequently reversed by this Court. On appeal in the Boca Raton case, this Court concluded that use of the prior convictions in the other murder case was harmless error because "[g]iven the nature and extent of other evidence in aggravation presented to the jury we concluded that its recommendation would have been unchanged." Id. at 990. We further concluded that the trial judge's sentence would have been the same because the prior violent felony aggravator was supported by Owen's conviction for attempted first-degree murder in a third case. In the instant case, however, we are not faced with whether other evidence satisfied the aggravator found by the court. Rather, we are dealing with evidence that was admitted for a singular purpose, but later was found to be unrelated to any of the aggravators actually presented to the jury. In Cole, one of the state's witnesses during the guilt phase of the trial made the following statement in response to a question by the prosecutor: "I was nosey and knew some history on K.C., so I decided to go outside and look at the tag on the car." 701 So.2d at 853. The defense moved for mistrial on the ground that the witness's reference to "history" referred to Cole's prison history. The court denied the motion but agreed to give a curative instruction, which was rejected by defense counsel. On appeal, this Court found that the remark was not so prejudicial as to warrant a mistrial because the remark "was isolated and inadvertent and was not focused upon." Id. Accordingly, we held that the trial court did not abuse its discretion in denying the motion for mistrial. Id.

Similarly, in Sireci, during a resentencing proceeding, the prosecutor asked one of the defendant's mental health experts, "It's what you expected to find of this man on death row, isn't that correct?" 587 So.2d at 452. The prosecutor's question violated a pretrial order prohibiting the state from mentioning to the jury that Sireci had been sentenced to death previously for the same murder. However, this Court found that "viewed in the context of the record as a whole," the question was inadvertent, the "reference to the prior death sentence was minimal," the jury would have determined by other means that Sireci had previously been sentenced to death for this crime, and, therefore, "the impact of merely mentioning a prior death sentence was negligible." Id. Accordingly, we held that "[t]he prosecutor's reference to the prior death sentence did not prejudice the defendant or play a significant role in the resentencing proceeding so as to warrant a mistrial." Id. at 453.